**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. CROIX**

| | |
|---|---|
| CITY OF CAMBRIDGE RETIREMENT SYSTEM, on behalf of itself and all other similarly situated, ) ) | CIVIL NO. _____/2015 |
| Plaintiff, ) ) | CLASS ACTION |
| v. ) ) ) | |
| ALTISOURCE ASSET MANAGEMENT CORPORATION, WILLIAM C. ERBEY, KENNETH D. NAJOUR, ASHISH PANDEY, and ROBIN N. LOWE, ) ) ) ) | |
| Defendants. ) | |

**COMPLAINT FOR VIOLATIONS OF**
**THE FEDERAL SECURITIES LAWS**

Plaintiff City of Cambridge Retirement System ("Plaintiff"), by and through its counsel,

alleges the following upon information and belief, except as to those allegations concerning Plaintiff,

which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, *inter*

*alia*, counsel's investigation, which includes review and analysis of: (a) regulatory filings made by

Alitsource Asset Management Corporation ("AAMC" or the "Company") with the United States

Securities and Exchange Commission ("SEC"); (b) press releases and media reports issued by and

disseminated by the Company; and (c) other public information regarding the Company.

## I.   INTRODUCTION:

1.     This securities class action is brought on behalf of all persons or entities that

purchased AAMC's publicly traded stock between April 19, 2013 through January 12, 2015,

inclusive (the "Class Period") and were damaged thereby.

2.     The claims asserted herein are alleged against the Company and certain of its

executive officers and directors (collectively, "Defendants"), and arise under Section 10(b) of the

Securities and Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

3.     AAMC provides asset management and certain corporate governance services to

institutional investors.   Its primary client is an affiliated company, Altisource Residential

Corporation ("Residential"), which is a public real estate investment trust ("REIT") that manages non-performing loans and foreclosed homes that it largely purchases from another affiliated company, Ocwen Financial Corporation ("Ocwen"). Notably, for fiscal year 2013, AAMC earned 100% of its revenue from its asset management agreement with Residential.

4.    Plaintiff alleges that Defendants fraudulently inflated AAMC's stock price during the Class Period by disseminating materially false and misleading statements, and failing to disclose material information, concerning the Company's relationship with, and conflicted transactions with, Residential, Ocwen, and other affiliated companies (defined below as the "Related Companies").

5.    Specifically, Defendants made false and/or misleading statements and/or failed to disclose a myriad of material information regarding AAMC's improper business and operational practices, including that contrary to public representations that AAMC entered into transactions with the Related Companies on an arm's-length basis, in reality, Defendant Erbey, repeatedly approved numerous transactions with the Related Companies (all of which he controlled) in direct contradiction to public assurances that he recused himself from such decisions.  As a result of the above, the Company's statements were materially false and misleading.

6.    Indeed, the Defendants repeatedly misrepresented that the Company earned money from arm's-length transactions with the Related Companies when in fact the contracts between the Related Companies were the result of an entangled web of incentives designed to enable Defendant Erbey to reap tremendous profit by manipulating transactions among the Related Companies.  These contracts, in particular the asset management agreement between AAMC and Residential, and the false representations regarding the true nature of the relationships between the Related Companies, served to artificially inflate AAMC's common stock throughout the Class Period.

7.    Despite Defendants' assurances concerning AAMC's legal compliance and lack of conflicts, the truth about Defendant Erbey's self-serving actions—and their material impact on AAMC—was revealed to investors through a series of disclosures related to an investigation by the

New York Department of Financial Services ("New York DFS"). That investigation ultimately led to the announcement on December 22, 2014, that Defendant Erbey would be resigning from his positions with each of the Related Companies, including AAMC. His resignation was pursuant to the terms of a settlement that Ocwen had entered with New York DFS that identified "serious conflicts of interests within the Related Companies.

8.      As a result of this announcement, AAMC's stock price declined nearly 23% from a closing price of $465.30 per share on December 19, 2014 to close at $356.50 per share on December 22, 2014, on high trading volume.

9.      Then, on January 13, 2015, the California Department of Business Oversight announced that it was seeking to suspend Ocwen's license to operate in the state, due to serious concerns over Ocwen's servicing practices and its treatment of California homeowners. In response to this news, AAMC's stock declined over 33% from a closing price of $321.81 per share on January 12, 2015 to close at $214.27 per share on January 13, 2015, on high trading volume. Between December 22, 2014 and January 13, 2015, AAMC's stock fell nearly 54%.

10.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's stock, Plaintiff and the other Class members have suffered significant losses and damages.

## II.      JURISDICTION AND VENUE:

11.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act, 15 U.S.C. §77v, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

12.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), (c) and (d). AAMC maintains its executive offices in this District, Defendant Erbey resides in this District, and many of the acts that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in and/or were issued from this District. In connection with the acts alleged in this complaint, Defendants, directly or indirectly,

used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.  PARTIES:

13.      Plaintiff City of Cambridge Retirement System represents approximately 5,400 active and retired public employees from Cambridge, Massachusetts, and manages more than $850 million in assets to provide for them in retirement.  Cambridge purchased publicly-traded common stock of AAMC at artificially inflated prices during the Class Period, as set forth in the accompanying Certification and incorporated by reference herein, and suffered damages as a result of the violations of the federal securities laws alleged herein.

14.      Defendant AAMC is incorporated in the United States Virgin Islands and maintains its principal executive offices at 402 Strand Street, Frederiksted, United States Virgin Islands 00840-3531.  AAMC's principal business is to provide asset management and corporate governance services to institutional investors and its primary client is a related company, Altisource Residential Corporation.  The Company's common stock trades on the New York Stock Exchange, which is an efficient market, under ticker symbol "AAMC."  As of January 16, 2015, there were approximately 1.1 million shares of AAMC stock held by public investors.

15.      Defendant William C. Erbey was at all relevant times, the Chairman of AAMC's board of directors.  AAMC announced on December 22, 2014 that, in connection with a consent order entered into between Ocwen and the New York DFS, Defendant Erbey would be stepping down as chairman of the board effective January 16, 2015.  Defendant Erbey also served as the Executive Chairman of Ocwen's board of directors since September 1996, as the Chief Executive Officer of Ocwen from January 1988 to October 2010 and as the President of Ocwen from January 1988 to May 1998.  Defendant Erbey holds 24% of AAMC's shares outstanding.

16.      Defendant Kenneth D. Najour served as the Chief Financial Officer of AAMC during the Class Period until October 2014, when he became AAMC's Chief Accounting Officer.  Prior to

joining AAMC, Defendant Najour served as Vice President of Finance and Chief Accounting Officer of Ocwen from March 2012 to March 2013.

17.     Defendant Ashish Pandey is, and was at all relevant times, the Chief Executive Officer of AAMC.  As of January 16, 2015, Pandey will replace Erbey as the Chairman of the board. Defendant Pandey previously served as the CEO of Correspondent One, an AAMC affiliate engaged in the acquisition and secondary marketing of government loans.  Defendant Pandey also previously served as Executive Vice President of Ocwen from July 2008 to August 2011 where he was responsible for overseeing asset management vehicles and capital deployment for mortgage servicing portfolio acquisitions for Ocwen.

18.     Defendant Robin N. Lowe has served as AAMC's Chief Financial Officer since October 2014.

19.     Defendants Erbey, Najour, Paney and Lowe are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, as senior executive officers and/or directors of AAMC, were privy to confidential, proprietary and material adverse non-public information concerning AAMC's operations, finances, financial condition and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

20.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct

complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of AAMC's business.

21.     Because of their positions with the Company, the Individual Defendants controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and publicly disseminated documents alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

22.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and is traded on the New York Stock Exchange and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to AAMC's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so the market price of AAMC's common stock would be based on truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

23.     The Individual Defendants are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of AAMC's publicly traded stock by disseminating materially false and misleading statements and/or concealing material adverse facts.

## IV.     <u>BACKGROUND:</u>

24.     At the center of the alleged fraud is Defendant Erbey, AAMC's founder, executive chairman and largest shareholder, who will serve as executive chairman until January 16, 2015 when

his forced resignation becomes effective.  Defendant Erbey is also the founder, executive chairman, and largest shareholder of several affiliated companies, including Ocwen, Residential, Altisource Portfolio Solutions, S.A. ("Portfolio Solutions"), Home Loan Servicing Solutions Ltd. ("HLSS"), and Southwest Business Corp. ("SWBC") (together with AAMC, the "Related Companies").

25.　　Previously, AAMC, Residential, Portfolio Solutions and Ocwen were all part of the same company.  In 2009, Portfolio Solutions was spun-off from Ocwen.  In 2012, AAMC and Residential were both formed when they were spun off from Portfolio Solutions.

26.　　AAMC's primary business is to provide asset management services to a variety of institutional investors, although its primary client is Residential, which is a public REIT managing non-performing loans and foreclosed homes that it acquires from Ocwen and then turns into rental homes.

27.　　Because AAMC's principal revenue source is its relationship with Residential, AAMC's financial performance is nearly entirely dependent on Residential's performance.  Indeed, for fiscal year 2013, 100% of AAMC's revenue was generated from its asset management agreement with Residential.  Further, as of December 31, 2013, AAMC had a mere seven employees and all of its executive officers were shared with Residential, including Defendants Pandey and Najour. AAMC's earnings conference calls were also often held in tandem with Residential's during the Class Period, and even on occasions that they were held separately, Residential's financial performance was the main topic for discussion, demonstrating the materiality of Residential's performance for AAMC.

28.　　Under the terms of AAMC's asset management contract with Residential, AAMC is responsible for, among other duties, (i) administering Residential's day-to-day operations; (ii) defining appropriate investment criteria for Residential in cooperation with Residential's Board of Directors; (iii) identifying, analyzing and executing acquisitions for Residential, including the acquisition of sub-performing and non-performing residential mortgage loan portfolios and related

financing activities; and (iv) analyzing Residential's sales of properties, as well as performing a number of other asset management and corporate governance functions.

29.     AAMC provides its management services to Residential in exchange for a large quarterly incentive fee and also receives reimbursement for any expenses incurred as it performs services for Residential.  As detailed in AAMC's Form 10-K filed with the SEC on February 20, 2014, the quarterly incentive fee that Residential paid to AAMC consisted of a complex formula. Specifically, the fee includes: "(i) 2% of all cash available for distribution by Residential to its stockholders and to us as incentive management fees…until the aggregate amount per share of available cash for the quarter…exceeds $0.161, then (ii) 15% of all additional available cash for the quarter until the quarterly per share distribution amount exceeds $0.193, then (iii) 25% of all additional available cash for distribution by Residential for the quarter until the quarterly per share distribution amount exceeds $0.257, and thereafter (iv) 50% of all additional available cash for distribution by Residential for the quarter."

30.     AAMC also maintained contractual relationships with Ocwen and Portfolio Solutions as part of its asset management agreement with Residential.  Specifically, AAMC oversaw Ocwen's servicing of Residential's mortgage loan portfolio and distributed servicing fees to Ocwen.  AAMC also oversaw the renovation, leasing and property services that Portfolio Services provided for Residential's single-family rental properties and distributed fees to Portfolio Solutions for its property management services.  And, because Residential obtained a large portion of its portfolio of loans and foreclosed homes from Ocwen, AAMC – as the management company for Residential, was charged with managing Residential's acquisition of that portfolio from Ocwen.

31.     Further, AAMC provides its asset management services to another affiliated company, NewSource Reinsurance Company ("NewSource"), a Bermuda title insurance and reinsurance company.  In October 2013, AAMC invested $2 million in NewSource, and in exchange received 100% of NewSource's common stock.  At the same time, RESI invested $18 million in

NewSource and received 100% of NewSource's non-voting preferred stock.  Under the terms of AAMC's investment in NewSource, in addition to the asset management fees it receives, AAMC also receives a performance fee equal to 90% of NewSource's net income after paying a preferred dividend of 12% to RESI.  As of September 30, 2014, AAMC received $2 million in revenue from NewSource for fiscal year 2014.

32.    Defendant Erbey's 24% stake in AAMC is much larger than his stake in Residential, which is just 5%.  Thus, for every dollar that Residential makes, Defendant Erbey's share is 5 cents, but for every dollar AAMC makes, his share is 24 cents.  Similarly, Erbey's stake of Ocwen is just 13%, compared to his 24% stake in Residential.

33.    Defendant Erbey also maintains dominant positions in Portfolio Solutions, which derives most of its revenue from services it provides to Ocwen in the form of mortgage servicing technologies.  Specifically, as of December 31, 2013, Defendant Erbey owned or controlled 26% of Portfolio Solutions' common stock.

34.    Because of these significant financial interests, Defendant Erbey was incentivized to inflate the fees that Residential paid to AAMC as his interest in AAMC is significantly higher than that in Residential.  As a result, he would be entitled to a greater distribution from AAMC (24 cents for every dollar AAMC makes compared to 5 cents for every dollar Residential makes).  Similarly, given the disparity between his large interest in AAMC and his smaller interest in Ocwen, Erbey was incentivized to reduce the fees that AAMC paid to Ocwen.  And, because AAMC's performance was tied to that of Residential, Erbey mas motivated to help Residential obtain assets from Ocwen at favorable prices.  For these reasons, it was *absolutely critical* that Defendant Erbey recuse himself from transactions between the Related Companies.

35.    Based upon its investigation, the New York DFS concluded that Defendant Erbey's financial interest in the Related Companies was extremely problematic.  Specifically, in February 2014, the New York DFS noted that Defendant Erbey's financial interests "raise[] the possibility that

management has the opportunity and incentive to make decisions…that are intended to [artificially] benefit the share price of [the] affiliated companies", including AAMC.  Further, because Ocwen profits from servicing loans before foreclosure, and the Related Companies primarily profit off a loan once it has gone into foreclosure, Erbey was motivated to move Ocwen's portfolio of mortgages into foreclosure.  As described by a housing consultant and former vice president at Goldman Sachs Group Inc.'s Litton Loan Servicing, "If a mortgage goes into foreclosure and you lose those servicing fees, so what" because "[y]our can funnel it to one of your other businesses and still make money from it."

36.     Indeed, despite repeated assurances by Defendants throughout the Class Period that the potential for conflict was adequately addressed, the relationships between the Related Companies were rife with conflicts.  Beginning in late 2013, Ocwen became the subject of regulatory scrutiny from numerous state attorneys general, the Consumer Financial Protection Bureau ("CFPB") and the New York DFS.  The CFPB and state attorneys general accused Ocwen of "significant and systemic misconduct that occurred at every stage of the mortgage servicing process."  Such misconduct included "unfair shortcuts, unauthorized fees, deception, and other illegal practices" like robo-signing, as well as the failure to provide accurate and timely information to borrowers about loan modifications and the improper denial of loan-modification relief to eligible borrowers.  Ocwen entered into a consent order with the CFPB and state attorneys general in December 2013 (the "CFPB Consent Order") and agreed to pay approximately $2.2 billion and to comply with the governing "Mortgage Servicing Practices," although it did not admit to any wrongdoing.

37.     Throughout 2014, the New York DFS uncovered numerous pieces of evidence concerning the relationship between Ocwen and the Related Companies, establishing that Defendant Erbey approved a number of related-party transactions in direct contradiction to public statements that he recused himself from such decisions.  For example, on February 26, 2014, the New York DFS sent a letter to Ocwen stating that it had "uncovered a number of potential conflicts of interest"

between Ocwen and the Related Companies that "*cast serious doubt on recent public statements made by the company that Ocwen had a 'strictly arm's-length business relationship*'" with the Related Companies.  The New York DFS particularly took issue with the fact that Ocwen and Portfolio Solutions shared the same IT-management systems and chief risk officer, who reported directly to Defendant Erbey in his positions at both Ocwen and Portfolio Solutions.

38.     Shortly thereafter, on April 21, 2014, the New York DFS sent a second letter to Ocwen, further detailing "significant concerns" about the extent to which Ocwen and Portfolio Solutions were engaged in self-dealing through a company called Hubzu, a subsidiary of Portfolio Solutions.  The letter revealed that, contrary to public representations that Portfolio Solutions charged Ocwen arm's length "market rates," Hubzu in fact charged Ocwen's customers *three times more* for its services than it charged non-affiliates.  Shortly thereafter, on August 4, 2014, the New York DFS sent Ocwen a third letter revealing that Ocwen's arrangements with Portfolio Solutions involved an unaffiliated insurance agent as an intermediary pass-through so that Ocwen and Portfolio Solutions did not directly contract with each other and Portfolio Solutions could still receive insurance commissions and fees for doing essentially nothing.

39.     Then, on August 12, 2014, Ocwen announced that it would need to restate its financial statements for fiscal year 2013 and the first quarter of 2014 because it had failed to properly account for certain of its transactions with the Related Companies that were recorded in violation of GAAP.  Ocwen also announced at the same time that it expected to report material weaknesses in its internal controls as a result of these GAAP violations.  Further, on August 19, 2014, Ocwen announced that it had received a subpoena in June 2014 from the Securities and Exchange Commission in connection with its close relationships with AAMC and the Related Companies. Also in August 2014, New York DFS made public documents contradicting AAMC's public statements during the Class Period.

40.     On December 22, 2014, it was revealed that, as part of a settlement between Ocwen and the New York DFS, Defendant Erbey would be stepping down as chairman of the board at AAMC effective January 16, 2015, as well as from his position as executive chairman at Ocwen and the other Related Companies in order to address "*serious conflicts of interest*" ("December 2014 DFS Settlement").  Under the terms of the December 2014 DFS Settlement, Ocwen agreed to pay $100 million to be used by the State of New York for housing, foreclosure relief and community redevelopment programs, and also agreed to pay $50 million to help former and current homeowners in New York who lost homes to foreclosure while their mortgages were being serviced by Ocwen. Ocwen was further required to acknowledge that it failed to properly deal with distressed homeowners, that it had saddled homeowners with excessive fees from certain of the Related Companies and that it failed to maintain adequate systems to service hundreds of billions of dollars in mortgages.

41.     In stark contrast to representations made throughout the Class Period, this news revealed to AAMC's investors the truth about the conflicts of interest at the Related Companies and that the Related Companies, including AAMC, had been used to enrich Defendant Erbey and other executives at the expense of AAMC's shareholders.

42.     Finally, on January 13, 2015, the California Department of Business Oversight announced that it was seeking to suspend Ocwen's license to operate in the state (one of Ocwen's major markets) due to serious concerns over its servicing practices and treatment of California homeowners.  The announcement came at the end of a two-year long investigation relating to Ocwen's servicing business in which Ocwen had repeatedly failed to fully cooperate.

## V.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT

43.     Throughout the Class Period, in regular press releases, conference calls and filings with the SEC, AAMC and the Individual Defendants repeatedly made false and misleading statements and omissions concerning the Company's business practices, including the propriety of the transactions that AAMC entered into with Residential, Ocwen and the other Related Companies, which created a false impression concerning AAMC's financial and operational status and future growth prospects.

44.     The Class Period begins on April 19, 2013 when AAMC issued a proxy statement for its annual shareholders' meeting (the "Proxy").  The Proxy described a policy that AAMC's board of directors had adopted to approve transactions with the Related Companies.  Specifically, the Proxy stated that:

> ***Our Board of Directors has adopted a policy and procedure for review, approval and monitoring of transactions involving us and related persons (directors and named executive officers or their immediate family members or stockholders owning greater than 5% or greater of our outstanding stock)*** within our written Code of Business Conduct and Ethics which is available at www.altisourceresi.com. This policy and procedure is not limited to related person transactions that meet the threshold for disclosure under the relevant SEC rules, as it broadly covers any situation in which a conflict of interest may arise.
>
> Any situation that potentially qualifies as a conflict of interest is to be immediately disclosed to the General Counsel to assess the nature and extent of any concern as well as the appropriate next steps.  The General Counsel will notify the Chairman of the Board if any such situation requires approval of the Board of Directors and related persons are required to obtain the prior written approval of the Audit Committee of the Board of Directors before participating in any transaction or situation that may pose a conflict of interest.  In considering a transaction, the Audit Committee will consider all relevant factors including (1) whether the transaction is in the best interests of Residential; (ii) alternatives to the related person transaction; (iii) whether the transaction is on terms comparable to those available to third parties; (iv) the potential for the transaction to lead to an actual or apparent conflict of interest and any safeguards imposed to prevent such actual or apparent conflict; and (v) the overall fairness of the transaction to Residential.  The Audit Committee will periodically monitor any approved transactions to ensure that there are no changed circumstances that would render it advisable for Residential to amend or terminate the transaction.

45.     Then, on May 9, 2013, AAMC issued a press release announcing its financial results for the first quarter of 2013. The press release, filed on Form 8-K with the SEC, stated in pertinent part that AAMC had experienced a net loss for the quarter of $840,000, and that during the first quarter AAMC had: (a) "completed an acquisition on behalf of Altisource Residential Corporation of a portfolio of non-performing residential mortgage loans (NPLs) having aggregate collateral market value of approximately $94.2 million"; (2) "completed an acquisition on behalf of Residential of an NPL portfolio having aggregate collateral  market value of approximately $38.7 million"; and (3) "on behalf of Residential, we entered into a $100 million Master Repurchase Agreement to finance the acquisition and ownership of sub-performing and non-performing residential mortgage loans and REO properties by Residential."

46.     In the same press release, Defendant Erbey stated that "AAMC is off to a solid start with successfully acquiring NPL portfolios that meet Residential's investment criteria, securing financing to leverage Residential's assets and completing an accretive follow-on equity offering to further grow the non-performing loan portfolios for Residential."   Defendant Pandey similarly commented that AAMC's "recent portfolio acquisitions and financing activities for Residential are important steps in building a sustainable business."

47.     On the same day, the Company filed its quarterly report for the period ended March 31, 2013 on Form 10-Q with the SEC that was signed by Defendants Pandey and Najour.

48.     The second quarter 2013 Form 10-Q specifically identified AAMC's transactions with the Related Companies as shown below:

*City of Cambridge Retirement System, v. Altisource Asset Management Corp., et al.*     *Dist. Ct. Civ. No. 2015/_____*
Complaint for Violations of the Federal Securities Laws          Page 15

|  | **Three Months Ended March 31, 2013** | **Counter-party** |
|---|---|---|
| Related party mortgage loan servicing costs | $392,000 | Ocwen Financial Corporation |
| Due diligence costs | $183,000 | Altisource Portfolio Solutions |
| Sublease and related occupancy costs | $24,000 | Ocwen Financial Corporation |
| Expense Reimbursements | $895,000 | Altisource Residential Corporation |

49. Based on a description of the transactions between the Related Companies described elsewhere in the Company's SEC filings, the fees in the chart above in ¶48 show that for the first quarter of 2013, AAMC paid: (i) $392,000 to Ocwen for servicing loans held by Residential and (ii) $24,000 to Ocwen for sublease costs. Further, AAMC received $895,000 from Residential for reimbursement of expenses. These payments were falsely represented as the result of contracts that had been purportedly negotiated on an arm's-length basis between the Related Companies and that Defendant Erbey was recused from the negotiation and implementation of such agreements. In reality, the payments were the result of conflicted negotiations and agreements from which Defendant Erbey failed to recuse himself

50. On July 23, 2013, AAMC issued a press release announcing its financial results for the second quarter of 2013. The press release, filed on Form 8-K with the SEC, stated in pertinent part that AAMC had experienced a net loss for the second quarter of $1.5 million, and that during the second quarter AAMC had: (1) "completed an acquisition of non-performing residential mortgage loans (NPLs) for Residential having an unpaid principal balance, or UPB, of $172.1 million"; (2) "completed a follow-on equity offering for Residential of 17,250,000 shares at $18.75 per share from which Residential received net proceeds of $309.5 million; and (3) "agreed to acquire two NPL portfolios for Residential with $470 million in UPB."

51.     In the same press release, Defendant Erbey stated that he was "pleased with the continued strong performance of AAMC and its management team on behalf of Residential in NPL acquisitions, loan resolutions and capital raising, three pillars of Residential's business." Defendant Pandey also praised AAMC's performance, stating that he was "encouraged by the early results of Residential's NPL portfolio and the progress made in loan resolutions in the short time period since inception of operations…Our success in portfolio acquisitions for Residential and the positive early results in loan resolution reflect our sound execution of Residential's business plan and strategy."

52.     On the same day, the Company filed its quarterly report for the period ended June 30, 2013 on Form 10-Q with the SEC that was signed by Defendants Pandey and Najour.

53.     The second quarter 2013 Form 10-Q specifically identified AAMC's transactions with the Related Companies as shown below:

|  | Three months ended June 30, 2013 | Counter-party |
|---|---|---|
| Related party mortgage loan servicing costs | $1,242,000 | Ocwen Financial Corporation |
| Due diligence costs | ---- | Altisource Portfolio Solutions |
| Sublease and related occupancy costs | $55,000 | Ocwen Financial Corporation |
| Expense reimbursements | $1,156,000 | Altisource Residential Corporation |

54.     Based on a description of the transactions between the Related Companies described elsewhere in the Company's SEC filings, the fees in the chart above in ¶53 show that for the second quarter of 2013, AAMC paid: (i) $1,242,000 to Ocwen for servicing loans held by Residential and (ii) $55,000 to Ocwen for sublease costs. Further, AAMC received $1,156,000 from Residential for reimbursement of expenses. These payments were falsely represented as the result of contracts that had been purportedly negotiated on an arm's-length basis between the Related Companies and that Defendant Erbey was recused from the negotiation and implementation of such agreements. In

reality, the payments were the result of conflicted negotiations and agreements from which Defendant Erbey failed to recuse himself.

55.     On October 22, 2013, AAMC announced its financial results for the third quarter of 2013.  The press release, filed on Form 8-K with the SEC, stated in pertinent part that AAMC had experienced a net loss for the quarter of $2.6 million and that during the third quarter AAMC had: (1) "facilitated the purchase of three portfolios of non-performing residential mortgage loans…for [Residential] having an aggregate market value of underlying properties of $712 million"; (2) "facilitated the entry into two master repurchase agreements with major financial institutions for Residential which have provided $325 million of additional borrowing capacity to finance the acquisition and ownership of sub-performing and non-performing residential mortgage loans and REO properties"; (3) "earned incentive management fees from Residential of $51,000 based on Residential's payment of a dividend of $0.10 to its stockholders"; (4) "priced the second accretive equity offering for Residential which closed on October 1, 2013, raising a total of $350 million"; and (5) "transferred the listing of our common stock from the OTCQX to the NYSE MKT."

56.     Commenting on AAMC's third quarter performance, Defendant Pandey stated "AAMC and its management team have continued to provide sound asset management services to Residential in growing Residential's NPL portfolio, providing additional accretive equity and debt capital for Residential to deploy and in managing the resolution of Residential's loans."  Defendant Erbey similarly stated that he was "proud of our implementation of Residential's differentiated business plan."

57.     On the same day, the Company filed its quarterly report for the third quarter of 2013 on Form 10-Q with the SEC that was signed by Defendants Pandey and Najour.

58.     The third quarter 2013 Form 10-Q specifically identified AAMC's transactions with the Related Companies as shown below:

| | Three months ended September 30, 2013 | Counter-party |
|---|---|---|
| Residential rental property operating expenses | $138,000 | Altisource Portfolio Solutions S.A. |
| Mortgage loan servicing costs | $2,134,000 | Ocwen Financial Corporation |
| Due diligence costs | $651,000 | Altisource Portfolio Solutions S.A. |
| Sublease and related occupancy costs | $74,000 | Ocwen Financial Corporation |
| Expense reimbursements | $1,307,000 | Altisource Residential Corporation |
| Management incentive fee | $51,000 | Altisource Residential Corporation |

59.     Based on a description of the transactions between the Related Companies described elsewhere in the Company's SEC filings, the fees in the chart above in ¶58 show that for the third quarter of 2013, AAMC paid: (i) $138,000 to Portfolio Solutions for managing properties owned by Residential, (ii) $2,134,000 to Ocwen for servicing loans held by Residential, (iii) $651,000 to Portfolio Solutions for due diligence costs; and (iv) $74,000 to Ocwen for sublease costs.  Further, AAMC was paid $1,307,000 by Residential for expense reimbursements, as well as a $51,000 management incentive fee.  These payments were falsely represented as the result of contracts that had been purportedly negotiated on an arm's-length basis between the Related Companies and that Defendant Erbey was recused from the negotiation and implementation of such agreements.  In reality, the payments were the result of conflicted negotiations and agreements from which Defendant Erbey failed to recuse himself.

60.     On December 3, 2013, Ocwen filed an investor presentation with the SEC bearing the logos of each of the Related Companies that described the benefits of Ocwen having created what it called "strategic allies" (i.e. the Related Companies).  The presentation stated that the "Strategic Allies have sound Corporate Governance," that each had "separate Boards and separate

management," that there were "Robust Related Party Transaction Approval Policies" in place and that they maintained "Transparency in inter-company relationships through public company disclosures."

61.     Further, speaking at the investor conference on December 3, 2013, Defendant Erbey described the relationship between the Related Companies, specifically stating that he wanted to "stress first of all that ***these companies are not affiliates, that they are independent companies***. They have independent boards and they have management teams."  He went on to assure investors that "each company has its own separate Board of Directors, the majority of whom are independent, and ***we have robust related party transaction approval process***.  ***Any related party transactions between the companies I actually recuse myself from that decision***."

62.     On February 20, 2014 AAMC announced its financial results for the fourth quarter of 2013 and fiscal year 2013.  The press release, filed on Form 8-K with the SEC, stated in pertinent part that AAMC had experienced a net loss for the quarter of $0.4 million and of $5.3 million for the year.  The Company further stated that for the quarter, it had (1) "generated positive adjusted earnings for the quarter of $4.0 million"; (2) "earned incentive management fees from [Residential] of $4.8 million"; and (3) "facilitated Residential's acquisition of three portfolios of non-performing residential mortgage loans…with an aggregate market value of underlying properties of $1.7 billion representing a 170% increase in underlying property value from the end of the third quarter."  For fiscal year 2013, the Company touted that it had: (1) "facilitated the acquisition of an aggregate of approximately 13,500 non-performing loans with $2.7 billion in underlying property value"; (2) "assisted Residential in raising $659 million in equity capital at accretive prices"; and (3) "assisted Residential in securing $750 million of portfolio debt financing."

63.     Commenting on the results, Defendant Pandey stated that "2013 was a successful year to AAMC and Residential.  Through our sound asset management services, Residential was successful in growing its NPL portfolio, securing additional debt and accretive equity capital and

managing the resolution of its loans."   Defendant Erbey continued, "We are proud of our implementation of Residential's differentiated business plan.  We believe that, with AAMC's guidance, Residential successfully delivered on every critical aspect of its business model in 2012…I am pleased with what we have been able to accomplish for Residential and for our shareholders in our first full year of operations."

64.    On February 20, 2014 AAMC also filed its Form 10-K reporting results for fiscal year 2013 ended December 31, 2013, which was signed by Defedants Pandey and Najour.

65.    The 2013 Form 10-K specifically identified AAMC's transactions with the Related Companies for the year as shown below:

|  | For the year ended December 31, 2013 | Counter-party |
|---|---|---|
| Residential rental property operating expenses | $767,000 | Altisource Portfolio Solutions S.A. |
| Mortgage loan servicing costs | $9,335,000 | Ocwen Financial Corporation |
| Due diligence and unsuccessful deal costs | $2,059,000 | Altisource Portfolio Solutions S.A. |
| Office and occupancy costs | $256,000 | Ocwen Financial Corporation |
| Salaries and Benefits | $1,273,000 | Ocwen Financial Corporation and Altisource Portfolio Solutions S.A. |
| Expense reimbursement | $5,411,000 | Altisource Residential Corporation |
| Incentive management fee | $4,880,000 | Altisource Residential Corporation |

66.    Based on a description of the transactions between the Related Companies described elsewhere in the Company's SEC filings, the fees in the chart above in ¶65 show that for fiscal year 2013, AAMC paid: (i) $767,000 to Portfolio Solutions for managing properties owned by Residential, (ii) $9,335,000 to Ocwen for servicing loans held by Residential, (iii) $2,059,000 to Portfolio Solutions for due diligence costs; (iv) $256,000 to Ocwen for sublease costs; and (v) $1,237,000 to Ocwen and Portfolio Solutions for salaries and benefits.  Further, AAMC was paid

$5,411,000 by Residential for expense reimbursements, as well as a $4,880,000 management incentive fee.  These payments were falsely represented as the result of contracts that had been purportedly negotiated on an arm's-length basis between the Related Companies and that Defendant Erbey was recused from the negotiation and implementation of such agreements.  In reality, the payments were the result of conflicted negotiations and agreements from which Defendant Erbey failed to recuse himself.

67.     Also in the 2013 Form 10-K, the Company stated that it implemented and adhered to:

> **[P]olicies, procedures and practices to avoid potential conflicts with respect to our dealings with Altisource [Portfolio Solutions], Ocwen and Residential, including our Chairman [Defendant Erbey] recusing himself from negotiations regarding, and approvals of, transactions with these entities (or where necessary, certain of our officers recusing themselves from discussions on, and approvals of transactions with Residential).**  We also manage potential conflicts of interest through oversight of independent members of Board of Directors (independent directors constitute a majority of our Board of Directors), and we will also seek to manage these potential conflicts through dispute resolution and other provisions of our agreements with Altisource [Portfolio Solutions], Ocwen and Residential.

68.     On April 29, 2014 AAMC announced its financial results for the first quarter of 2014. The press release, filed on Form 8-K with the SEC, stated in pertinent part that AAMC had experienced net income of $6.8 million for the first quarter of 2013 and that AAMC had (1) "achieved first quarter of positive net income since inception"; (ii) "issued 250,000 shares of a new non-voting Series A Convertible Preferred Stock to institutional investors for aggregate proceeds of $248.9 million"; (3) "facilitated the resolution of 822 loans by [Residential] in the first quarter of 2014 versus 288 loans in the fourth quarter of 2013"; and (4) "facilitated Residential's agreement to purchase a portfolio with an aggregate of 915 mortgage loans and real estate owned ("REO") properties having an aggregate market value of underlying properties of $180.0 million."

69.     Commenting on the results, Defendant Pandey stated that "We expect Residential's improved loan resolutions will have a meaningful impact on the growth of Residential's loan

portfolio," and Defendant Erbey similarly noted that "Under the management of AAMC, Residential has been able to pay an increased dividend for the second consecutive quarter."

70.     On the same day, the Company filed its quarterly report for the first quarter of 2014 on Form 10-Q with the SEC that was signed by Defendants Pandey and Najour.

71.     The first quarter 2014 Form 10-Q specifically identified AAMC's transactions with the Related Companies as shown below:

|  | Three months ended March 31, 2014 | Counter-party |
|---|---|---|
| Residential rental property operating expenses | $1,050,000 | Altisource Portfolio Solutions S.A. |
| Mortgage loan servicing costs | $10,490,000 | Ocwen Financial Corporation |
| Due diligence and unsuccessful deal costs | $111,000 | Altisource Portfolio Solutions S.A. |
| Office and occupancy costs | $74,000 | Ocwen Financial Corporation |
| Salaries and benefits | $517,000 | Ocwen Financial Corporation and NewSource Reinsurance Company Ltd. |
| Expenses reimbursements | $1,780,000 | Altisource Residential Corporation and NewSource Reinsurance Company Ltd. |
| Management incentive fee | $10,911,000 | Altisource Residential Corporation |

72.     Based on a description of the transactions between the Related Companies described elsewhere in the Company's SEC filings, the fees in the chart above in ¶71 show that for the first quarter of 2014, AAMC paid: (i) $1,050,000 to Portfolio Solutions for managing properties owned by Residential, (ii) $10,490,000 to Ocwen for servicing loans held by Residential, (iii) $111,000 to Portfolio Solutions for due diligence costs; (iv) $74,000 to Ocwen for office costs; and (v) $517,000 to Ocwen and Portfolio Solutions for salaries and benefits.  Further, AAMC was paid $1,780,000 by Residential and NewSource for expense reimbursements, in addition to a $10,911,000

management incentive fee from Residential.  These payments were falsely represented as the result of contracts that had been purportedly negotiated on an arm's-length basis between the Related Companies and that Defendant Erbey was recused from the negotiation and implementation of such agreements.  In reality, the payments were the result of conflicted negotiations and agreements from which Defendant Erbey failed to recuse himself.

73.     The first indication that the contracts and relationships between the Related Companies were not conducted on an arm's-length basis occurred on June 23, 2014.  On that day, it was announced that Residential had been shut out of a distressed loan auction conducted by the U.S. Department of Housing and Urban Development.  In reaction to this news, AAMC's stock price dropped 21.7% to $279.12 per share.  Investors linked Residential's failure at the auction to the New York DFS investigation of Ocwen.  Indeed, that same day, the *Housing Wire* published an article indicating that the loss of the auction was potentially linked to the New York DFS' investigations into the relationships between Ocwen, AAMC, Residential and the other Related Companies. *Housing Wire* noted that the concern driving the New York DFS investigation was that "those companies are charging inflated fees through conflicted business relationships, and thereby negatively impacting homeowners and mortgage investors."

74.     On July 22, 2014 AAMC announced its financial results for the second quarter of 2014.  The press release, filed on Form 8-K with the SEC, stated in pertinent part that AAMC had experienced net income of $12.2 million and reported that for the quarter it had (1) "generated management incentive fees of $13.7 million"; (2) "facilitated Residential's agreement to acquire an aggregate of 4,374 non-performing and re-performing mortgage loans having an aggregate market value of underlying properties of $1.23 billion"; (3) "managed Residential's resolution of 1,156 loans, up from 822 loans in the first quarter of 2014; (4) "facilitated an increase in Residential's rental portfolio to 142 properties, well in excess of its targeted 100 rental properties by June 30, 2014"; and (4) was in "advanced stages of launching NewSource as a second managed client for

AAMC that focuses on housing related reinsurance products with limited catastrophe risk and high operations intensity."

75.     On the same day, the Company filed its quarterly report for the second quarter of 2014 on Form 10-Q with the SEC signed by Defendants Pandey and Najour.

76.     The second quarter 2014 Form 10-Q specifically identified AAMC's transactions with the Related Companies, as shown below:

| | Three months ended June 30, 2014 | Counter-party |
|---|---|---|
| Residential rental property operating expenses | $3,169,000 | Altisource Portfolio Solutions S.A. |
| Mortgage loan servicing costs | $14,942,000 | Ocwen Financial Corporation |
| Due diligence and unsuccessful deal costs | $1,655,000 | Altisource Portfolio Solutions S.A. |
| Office and occupancy costs | $69,000 | Ocwen Financial Corporation and Altisource Portfolio Solutions S.A. |
| Salaries and benefits | $612,000 | Ocwen Financial Corporation and Altisource Residential Corporation |
| Expense reimbursements | $1,999,000 | Altisource Residential Corporation and NewSource Reinsurance Company Ltd. |
| Management incentive fee | $13,715,000 | Altisource Residential Corporation |

77.     Based on a description of the transactions between the Related Companies described elsewhere in the Company's SEC filings, the fees in the chart above in ¶76 show that for the second quarter of 2014, AAMC paid: (i) $3,169,000 to Portfolio Solutions for managing properties owned by Residential, (ii) $14,942,000 to Ocwen for servicing loans held by Residential, (iii) $1,655,000 to Portfolio Solutions for due diligence costs; (iv) $69,000 to Ocwen for office costs; and (v) $612,000 to Ocwen and Portfolio Solutions for salaries and benefits.  Further, AAMC was paid $1,999,000 by Residential and NewSource for expense reimbursements, in addition to a $13,715,000

*City of Cambridge Retirement System, v. Altisource Asset Management Corp., et al.*      Dist. Ct. Civ. No. 2015/_____
Complaint for Violations of the Federal Securities Laws                                                        Page 25

management incentive fee from Residential.  These payments were falsely represented as the result of contracts that had been purportedly negotiated on an arm's-length basis between the Related Companies and that Defendant Erbey was recused from the negotiation and implementation of such agreements.  In reality, the payments were the result of conflicted negotiations and agreements from which Defendant Erbey failed to recuse himself.

78.      Then, on July 31, 2014, Ocwen reported a sizable earnings miss for its second fiscal quarter, which it blamed on a host of regulatory issues that continued to plague it.  In response to this news, AAMC's stock price fell $119.70 per share over the next two days, reflecting investors' concern that the regulatory pressure on Ocwen related to the extensive ties among the Related Companies.  However, in Ocwen's press release issued on July 31, Defendant Erbey assured the market that Ocwen's business was still strong, that the loans Ocwen originated through certain businesses "will generate significant future profits" and that Ocwen was planning to expand into new areas of business, such as residential mortgage backed securities.  Indeed, Piper Jaffray noted in a report issued on the same day that Ocwen "continues to be well positioned post CFPB settlement, strong capital and successful servicing transfer record" and that the "RMBS deal is positive." Because of these assurances, the truth about the relationship between the Related Companies was still not fully revealed.

79.      Then, on October 21, 2014, the New York DFS sent another letter to Ocwen stating that Ocwen had failed to comply with federal regulations and was deliberately failing to modify mortgages and threatened to take "whatever action necessary" to rectify the issue.  In response to this news, AAMC's stock fell a total of $115.98 per share over the next day and a half.  In response to this letter, Ocwen stated in a press release on October 21 that it was "continuing its investigation into these matters" and that it was "working with and fully cooperating with DFS and the Monitor to address their concerns."  As a result of these assurances, the truth about the nature of the conflicted relationships between the Related Companies was still not revealed.

80.     On November 4, 2014 AAMC announced its financial results for the third quarter of 2014.  The press release, filed on Form 8-K with the SEC, stated in pertinent part that AAMC had experienced net income of $37.8 million and reported that for the quarter it had (1) "generated management incentive fees of $19.5 million"; (2) "facilitated Residential's first non-performing loan securitization transaction, with gross proceeds to Residential of approximately $150.0 million"; (3) "managed Residential's resolution of 1,510 loans, up 31% from the 1,156 loans it resolved in the second quarter of 2014"; and (4) "repurchased 54,465 shares of AAMC's common stock."

81.     On the same day, the Company filed its quarterly report for the second quarter of 2014 on Form 10-Q with the SEC signed by Defendants Pandey and Lowe.

82.     The third quarter 2014 Form 10-Q specifically identified AAMC's transactions with the Related Companies as shown below:

|  | Three months ended September 30, 2014 | Counter-party |
|---|---|---|
| Residential rental property operating expenses | $7,038000 | Ocwen Financial Corporation and Altisource Portfolio Solutions S.A. |
| Mortgage loan servicing costs | $22,173,000 | Ocwen Financial Corporation |
| Due diligence and unsuccessful deal costs | $4,000 | Altisource Portfolio Solutions S.A. |
| Office and occupancy costs | $91,000 | Ocwen Financial Corporation and Altisource Portfolio Solutions S.A. |
| Salaries and benefits | $485,000 | Ocwen Financial Corporation and Altisource Residential Corporation |
| Expense reimbursements | $1,801,000 | Altisource Residential Corporation and NewSource Reinsurance Company Ltd. |
| Management incentive fee | $19,503,000 | Altisource Residential Corporation |

83.     Based on a description of the transactions between the Related Companies described elsewhere in the Company's SEC filings, the fees in the chart above in ¶82 show that for the third

quarter of 2014, AAMC paid: (i) $7,038,999 to Ocwen and Portfolio Solutions for managing properties owned by Residential, (ii) $22,173,000 to Ocwen for servicing loans held by Residential, (iii) $4,000 to Portfolio Solutions for due diligence costs; (iv) $91,000 to Ocwen for office costs; and (v) $484,000 to Ocwen and Portfolio Solutions for salaries and benefits.  Further, AAMC was paid $1,801,000 by Residential and NewSource for expense reimbursements, in addition to a $19,503,000 management incentive fee from Residential.  These payments were falsely represented as the result of contracts that had been purportedly negotiated on an arm's-length basis between the Related Companies and that Defendant Erbey was recused from the negotiation and implementation of such agreements.  In reality, the payments were the result of conflicted negotiations and agreements from which Defendant Erbey failed to recuse himself.

84.    The statements above at ¶43-¶83 were false and misleading and/or omitted material facts regarding the Company's business and operations.  Specifically, the statements above failed to disclose (i) the true nature of the relationship between the Related Parties and (ii) that the transactions that took place between the Related Parties were the result of an unfair process from which Defendant Erbey failed to recuse himself, despite his admittedly conflicted interests.  The statements above were further false and misleading because the fees that the Company paid to and received from the Related Companies during the Class Period were not the result of arm's-length negotiations, enabling the Company to be overcompensated on certain fees it received and underpay on certain transactions.  As a result, the Company's disclosures concerning its transactions with the Related Companies did not provide a fair presentation of the Company's finances and operations. As a result of the above, the Company's statements were materially false and misleading at all relevant times and lacked in any reasonable basis when made.

*City of Cambridge Retirement System, v. Altisource Asset Management Corp., et al.*   *Dist. Ct. Civ. No. 2015/_____*
Complaint for Violations of the Federal Securities Laws   Page 28

## VI.   THE NEW YORK DFS SETTLEMENT

85.   On December 22, 2014, the New York DFS announced that it had entered into a settlement with Ocwen to address "serious conflict of interest issues" that had been uncovered during its investigation.  As part of the December 2014 DFS Settlement, Defendant Erbey was forced to resign from his executive chairman position at Ocwen, as well as from his positions of chairman at AAMC and each of the Related Companies effective January 16, 2015.

86.   The New York DFS specifically noted that its review of Ocwen had "uncovered a number of conflicts of interest between Ocwen and [the Related Companies] all of which are chaired by Mr. Erbey, who is also the largest individual shareholder of each and the Executive Chairman of Ocwen."

87.   Under the terms of the December 2014 DFS Settlement, Ocwen was required pay a total of $150 million in fines to help current and former homeowners in New York who had lost their homes to foreclosure while their loans were being serviced by Ocwen and to aid in developing housing, foreclosure relief and community redevelopment programs.  Ocwen was further required to acknowledge that it had saddled borrowers with excessive fees resulting from its transactions with the Related Companies, including AAMC, and that it failed to maintain adequate systems to service hundreds of billions of dollars in mortgages.

88.   In response to this news, and as the truth was fully revealed about AAMC's relationship with the Related Companies, AAMC's stock price plummeted over 23% from a closing price of $465.30 per share on December 19, 2014 to close at $356.50 per share on December 22, 2014.

89.   Then, on January 13, 2015, the California Department of Business Oversight announced that it was seeking to suspend Ocwen's license to operate in the state (one of Ocwen's major markets) due to serious concerns over its servicing practices and treatment of California

homeowners.  The announcement came at the end of its two-year investigation relating to Ocwen's servicing business in which Ocwen had repeatedly failed to fully cooperate.

90.    This news stunned the market and in response, AAMC's stock declined nearly 34% from a closing price of $321.81 per share on January 12, 2015 to close at $214.27 per share on January 13, 2015, on high trading volume.

## VII.   LOSS CAUSATION

91.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of AAMC's common stock and operated as a fraud or deceit on Class Period purchasers of AAMC's common stock by failing to disclose to investors the true nature of the Company's relationship with the Related Companies.  When Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the prices of AAMC's stock fall precipitously as the prior inflation came out of the Company's stock price.  As a result of their purchases of AAMC's stock during the Class Period, Plaintiff and the other Class members suffered economic loss.

92.    By failing to disclose the true state of the Company's business, investors were not aware of the Company's true condition.  Therefore, Defendants presented a misleading picture of AAMC's business and prospects.  Thus, instead of truthfully disclosing during the Class Period the true state of the Company's business, Defendants caused AAMC to conceal the truth.

93.    Defendants' false and misleading statements had the intended effect and caused AAMC's common stock to trade at artificially inflated levels throughout the Class Period. However, as a direct result of the Company's problems coming to light and the announcement that Defendant Erbey was being forced to resign from each of the Related Companies, AAMC's common stock price to fall approximately 54% from December 22, 2014 to January 13, 2015.  This drop removed the inflation from the price of AAMC's stock causing real economic loss to investors who purchased the Company's stock during the Class Period.

94.     The decline in the price of AAMC's common stock after the truth came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of AAMC's common stock price decline negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.  The economic loss suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of AAMC's stock and the subsequent decline in the value of AAMC's stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## VIII.     INAPPLICABILITY OF STATUTORY SAFE HARBOR

95.     AAMC's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

96.     Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of AAMC who knew that the statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## IX.     PRESUMPTION OF RELIANCE

97.     At all relevant times, the market for AAMC's stock was an efficient market for the following reasons, among others:

a.      AAMC's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b.      As a regulated issuer, AAMC filed periodic public reports with the SEC and the NYSE; and

c.      AAMC regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

98.      As a result of the foregoing, the market for AAMC stock promptly digested current information regarding AAMC from all publicly available sources and reflected such information in the price of AAMC stock.  Under these circumstances, all purchasers of AAMC stock during the Class Period suffered similar injury through their purchase of AAMC stock at artificially inflated prices and the presumption of reliance applies.

99.      A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the true of nature of AAMC's relationship with the Related Companies—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of disclosing the true nature of the transactions with the Related Companies, as set forth above, that requirement is satisfied here.

*City of Cambridge Retirement System, v. Altisource Asset Management Corp., et al.*      *Dist. Ct. Civ. No. 2015/____*
Complaint for Violations of the Federal Securities Laws                                                              Page 32

## X.    CLASS ACTION ALLEGATIONS

100.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased or otherwise acquired the publicly traded stock of AAMC during the Class Period.  Excluded from the Class are Defendants and their families, directors, and officers of AAMC and their families and affiliates.

101.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of January 16, 2015, there were approximately 1.1 million shares of AAMC stock outstanding, owned by numerous investors.

102.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a.    Whether Defendants violated the Exchange Act;

b.    Whether Defendants omitted and/or misrepresented material facts;

c.    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

d.    Whether the Individual Defendants are personally liable for the alleged misrepresentations and omissions described herein;

e.    Whether the price of AAMC stock was artificially inflated;

f.    Whether Defendants' conduct caused the members of the Class to sustain damages; and

g.    The extent of damage sustained by Class members and the appropriate measure of damages.

103.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damage from Defendants' wrongful conduct.

104.     Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

105.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Joinder of all Class members is impracticable.

## COUNT I

### FOR VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 AGAINST ALL DEFENDANTS

106.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

107.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase AAMC common stock at artificially inflated prices.

108.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's stock in an effort to maintain artificially high market prices for AAMC common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

109.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial

well-being, operations, and prospects.

110.     During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

111.     Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.  Defendants engaged in this misconduct to conceal AAMC's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

112.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for AAMC common stock.  Plaintiff and the Class would not have purchased the Company's stock at the prices they paid, or at all, had they been aware that the market prices for AAMC common stock had been artificially inflated by Defendants' fraudulent course of conduct.

113.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's stock during the Class Period.

114.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### FOR VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS

115.     Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

116.     The Individual Defendants acted as controlling persons of AAMC within the meaning

of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about AAMC, the Individual Defendants had the power and ability to control the actions of AAMC and its employees.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XI.   **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment as follows:

A.      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees;

D.      Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## XII.   **JURY DEMAND**

Plaintiff demands a trial by jury.

*City of Cambridge Retirement System, v. Altisource Asset Management Corp., et al.*　　*Dist. Ct. Civ. No. 2015/____*
Complaint for Violations of the Federal Securities Laws　　　　　　　　　　　　　　　　　　Page 36

**DATED:** January 16, 2015　　　　　　Respectfully submitted,
　　　　　　　　　　　　　　　　　　**A. J. WEISS & ASSOCIATES**

　　　　　　　　　　　By:　　　　/s/ A. Jeffrey Weiss, Esq.
　　　　　　　　　　　　　　　A. Jeffrey Weiss, Esq.
　　　　　　　　　　　　　　　6934 Vessup Lane
　　　　　　　　　　　　　　　St. Thomas, U.S. Virgin Islands 00802-1001
　　　　　　　　　　　　　　　Telephone: (340) 777-3011
　　　　　　　　　　　　　　　Telecopier: (340) 777-3019
　　　　　　　　　　　　　　　Email: jeffweiss@weisslaw-vi.net
　　　　　　　　　　　　　　　*Local Counsel for Plaintiff City of Cambridge*
　　　　　　　　　　　　　　　*Retirement System*

　　　　　　　　　　　　　　　and

　　　　　　　　　　　By:　　　Avi Josefson, Esq.
　　　　　　　　　　　　　　　**BERNSTEIN LITOWITZ BERGER &**
　　　　　　　　　　　　　　　**GROSSMAN, LLP**
　　　　　　　　　　　　　　　1285 Avenue of the Americas
　　　　　　　　　　　　　　　New York, New York 10019
　　　　　　　　　　　　　　　Telephone: (212) 554-1400
　　　　　　　　　　　　　　　Telecopier: (212) 554-1444
　　　　　　　　　　　　　　　Email: avi@blbglaw.com
　　　　　　　　　　　　　　　*Counsel for Plaintiffs City of Cambridge Retirement*
　　　　　　　　　　　　　　　*System*