IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

| | |
|---|---|
| CITY OF CAMBRIDGE RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, | Case No. 1:15-cv-00004-WAL (GWC) |
| Plaintiff, | CLASS ACTION |
| v. | |
| ALTISOURCE ASSET MANAGEMENT CORPORATION, WILLIAM C. ERBEY, KENNETH D. NAJOUR, ASHISH PANDEY, and ROBIN N. LOWE, | |
| Defendants. | |

**CONSOLIDATED COMPLAINT
FOR VIOLATION OF FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................................1

II.    JURISDICTION AND VENUE ..........................................................4

III.   PARTIES ...............................................................................................5

    A.    The Court-Appointed Lead Plaintiff .......................................5

    B.    The Defendants ........................................................................5

IV.   BACKGROUND:  THE OCWEN-RELATED COMPANIES .........8

    A.    Altisource Asset Management Corporation...............................9

    B.    Altisource Residential Corporation........................................10

    C.    Ocwen Financial Corporation ................................................11

    D.    Altisource Portfolio Solutions................................................13

    E.    Home Loan Servicing Solutions .............................................14

V.    AAMC'S CONTINUED SUCCESS WAS DEPENDENT UPON OCWEN'S ABILITY TO PROPERLY PERFORM ITS SERVICING OBLIGATIONS..................14

VI.   OMISSIONS OF MATERIAL FACT PRIOR TO AND  THROUGHOUT THE CLASS PERIOD ........................................................................16

    A.    Ocwen's Serving Platform Was Materially Flawed ...............16

    B.    Transactions Between the Ocwen-Related Companies Suffered From Serious Conflicts of Interest...................................................17

        a.    AAMC's management fee was unreasonably high and unsustainable..................................................................17

        b.    Ocwen's Chief Risk Officer and other senior managers were simultaneously employed by Altisource. ...............18

        c.    Ocwen pays above-market rates to Altisource for Hubzu listings. ...............................................................19

        d.    Defendant Erbey directly approved a force-placed insurance transaction that funneled $65 million annually from Ocwen to Altisource..........................................19

VII.     FALSE AND MISLEADING STATEMENTS DURING THE CLASS
         PERIOD ..................................................................................................19

VIII.    FOLLOWING ERBEY'S OUSTER, THE NON-CONFLICTED BOARD
         SLASHES THE AAMC MANAGEMENT FEE TO A MORE
         REASONABLE LEVEL ............................................................................41

IX.      ADDITIONAL SCIENTER ALLEGATIONS ...............................................42

         A.     The Structure of the Ocwen-Related Companies Created a Powerful
                Motive for RESI to Overpay AAMC .......................................................42

         B.     Ocwen's Improper Practices Enriched Defendant Erbey .......................43

         C.     Defendant Erbey's Positions Within the Ocwen-Related Companies
                Raises a Strong Inference of Scienter ...................................................44

X.       LOSS CAUSATION ....................................................................................45

XI.      CLASS ACTION ALLEGATIONS .............................................................49

XII.     APPLICABILITY OF PRESUMPTION OF RELIANCE ..............................50

         A.     The Fraud on the Market Doctrine .......................................................51

         B.     The Presumption of Reliance on Material Omissions ...........................52

XIII.    NO SAFE HARBOR ...................................................................................52

XIV.     COUNTS......................................................................................................53

COUNT I Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated
         Thereunder Against All Defendants .......................................................53

COUNT II Violation of Section 20(a) of the Exchange Act Against the Individual
         Defendants .............................................................................................54

PRAYER FOR RELIEF .........................................................................................54

JURY TRIAL DEMANDED.....................................................................................55

Lead Plaintiff Denver Employees Retirement Plan (the "Denver Plan" or "Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief is based upon, *inter alia*, counsel's investigation, which includes review and analysis of (i) regulatory filings made by Altisource Asset Management Corporation ("AAMC" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (ii) press releases and media reports issued by and disseminated by the Company; (iii) publications by regulatory agencies, including the New York Department of Financial Services and the Consumer Financial Protection Bureau; (iv) public filings by entities related to AAMC and (v) other public information regarding AAMC.

## I.    INTRODUCTION

1.    This securities class action is brought on behalf of all persons or entities that purchased AAMC's publicly traded stock during the period April 19, 2013 through January 12, 2015 (the "Class Period"), and were damaged thereby.

2.    Plaintiff's claims are brought against the Company and certain of its current and former executive officers and directors (collectively, "Defendants"), and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

3.    Defendant AAMC is one of five separate, publicly traded companies (the "Ocwen-Related Companies") for which Defendant William Erbey served as Chairman and owned varying percentages of the companies' stock.  These companies provided various services to each other at prices that were purportedly set at "arm's length" by independent directors.

- 1 -

Defendant Erbey promised to recuse himself from all decisions regarding related-party transactions in recognition of the conflicts of interest existing in transactions between companies in which Erbey was Chairman, but had significantly varying ownership percentages.  For example, Erbey owned 4% of Altisource Residential Corp. ("RESI" or "Residential") and 28% of AAMC.  Accordingly, for every dollar of profit that he could divert from RESI to AAMC, he would increase his personal profit by $0.24 (from $0.04 to $0.28).

4.      Ocwen Financial Corporation ("Ocwen") is the fourth-largest servicer of mortgages in the U.S.  The other Ocwen-Related Companies are in the business of either providing servicing-related business to Ocwen, foreclosing on mortgages serviced by Ocwen, or owning portfolios of foreclosed properties that were formerly owned by Ocwen.

5.      Defendant AAMC is the investment advisor to RESI, which is a real estate investment trust containing a portfolio of single-family rental properties.  Instead of purchasing the rental properties from a willing seller, RESI buys pools of Non-performing loans ("NPLs"), and forecloses on the majority of the NPLs to obtain the underlying real estate.  AAMC was compensated by being paid a quarterly incentive management fee calculated by a formula based on the amount of cash available for distribution to RESI shareholders.  This formula was purportedly fair and reasonable, with Erbey claiming to have recused himself from any role in approving the fee.  In actuality, the fee that AAMC charged RESI was secretly excessive, estimated by one market analyst to be between four and seven times the appropriate rate.

6.      Because RESI requires a "steady flow" of NPLs (most of which it purchases from Ocwen) to maintain its profitability, it is dependent on Ocwen's ability to sustain its growth and continue to obtain more Mortgage Servicing Rights ("MSRs").

7.      However, undisclosed to AAMC's shareholders, Ocwen's serving platform was materially flawed and unable to accommodate the ever-increasing number of MSRs Ocwen was purchasing.  This lead to an inordinate amount of regulatory problems such as backdating of letters to debtors and disseminating false information to borrowers.  These problems served to abuse debtors, and quickly drew the attention of regulators.

8.      Throughout the Class Period, AAMC reported excellent financial results, causing the company's stock to increase from less than $200 per share prior to the start of the Class period to trade as high as $1,200 per share.

9.      Beginning in February 2014, the New York Department of Financial Services ("NYDFS"), which had been investigating the Ocwen-Related Companies, reported that it had concerns regarding potential conflicts of interest regarding the related-party transactions between the Ocwen-Related Companies.  Indeed, the NYDFS exercised its authority to prevent Ocwen from purchasing more MSRs while it continued its investigation.

10.     By August of 2014, the NYDFS had determined that Defendant Erbey had falsely promised to recuse himself from approving related-party transactions, and had pushed through a transaction between Ocwen (in which he owned 14% of the shares) and Altisource Portfolio Solutions (in which he owned 29% of the shares).  Given the differing ownership percentages, Defendant Erbey would profit by diverting money from Ocwen to Altisource Portfolio Solutions. And that is just what he did.  After its investigation, the NYDFS found that the transaction "appears designed to funnel as much as $65 million in fees" from Ocwen to Altisource Portfolio Solutions.

11.     By October 21, 2014, the NYDFS disclosed that it had "uncovered serious problems with Ocwen's systems and processes," and warned Ocwen that it would "[t]ake

- 3 -

whatever action necessary to ensure that borrowers are protected."  Shares of AAMC declined dramatically to close at $635.00 per share.

12.     On December 22, 2014, the NYDFS issued a report disclosing that it had "uncovered a number of conflicts of interest between the Ocwen-Related Companies," specifically finding that "Mr. Erbey has not in fact recused himself from approvals of several transactions with the related parties."  As part of a settlement, the NYDFS required Erbey to resign his Chairman positions at the Ocwen-Related Companies.  In response, AAMC shares declined from a close of $465.30 on December 21, 2014, to close at $356.50 per share on December 22, 2014.  A one-day loss of 23%.

13.     The Class Period closes on January 12, 2015, when it was reported that the California Department of Business Oversight was seeking to suspend Ocwen's license to do business in the state.  This disclosure caused AAMC's share price to plummet nearly 34%, from $321.81 per share to close at $214.27 per share.

14.     On March 31, 2015, following the end of the Class Period, the Company announced that it was lowering its incentive management fee to about 50% of what they had been paying when Erbey was in charge.

## II.     JURISDICTION AND VENUE

15.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

- 4 -

17.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  AAMC maintains its executive offices in this District, Defendant Erbey resides within this District, and many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

18.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

### III.     PARTIES

**A.     The Court-Appointed Lead Plaintiff**

19.     Lead Plaintiff Denver Employees Retirement Plan is a governmental defined benefit pension plan that provides retirement benefits to qualified members of the City and County of Denver, Colorado, the Denver Health and Hospital Authority, and the Denver Employees Retirement Plan itself.  The Denver Plan, as set forth in its previously filed certification which is incorporated by reference herein, purchased the common stock of AAMC at artificially inflated prices during the Class Period and has suffered damages as the result of the violations of federal securities laws as alleged herein.

**B.     The Defendants**

20.     Defendant Altisource Asset Management Corporation ("AAMC" or the "Company") is a corporation established under the laws of the United States Virgin Islands, with its principal place of business at 36C Strand Street, Christiansted, United States Virgin Islands 00820.  The Company's common stock trades on the New York Stock Exchange under the ticker

- 5 -

Symbol "AAMC."  As of April 30, 2015, AAMC had 2,228,823 shares of common stock outstanding.

21.     The following current and former officers and directors of AAMC (the "Individual Defendants") are also defendants in this action:

(a)     Defendant William C. Erbey ("Erbey") was the Chairman of the Board of Directors of AAMC throughout the Class Period.  On December 22, 2014, AAMC announced that in connection with a consent order entered into between Ocwen and the NYDFS, Defendant Erbey would be stepping down as Chairman of the Board effective January 16, 2015.

(b)     Defendant Kenneth D. Najour ("Najour") was Chief Financial Officer of the Company until October 2014, when he became AAMC's Chief Accounting Officer.

(c)     Defendant Ashish Pandey ("Pandey") is, and was at all relevant times, the Chief Executive Officer of AAMC. As of January 16, 2015, Pandey replaced Erbey as the Chairman of the Board.

(d)     Defendant Robin N. Lowe ("Lowe") has served as AAMC's Chief Financial Officer since October 2014.

22.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of AAMC, were privy to confidential and proprietary information concerning AAMC, its operations, finances, financial condition, and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning AAMC, as discussed in detail below.  Because of their positions with AAMC, the Individual Defendants had access to non-public information about its business, finances, products, markets, and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at

- 6 -

management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

23.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of AAMC's business.

24.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

25.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and whose securities were traded on the New York Stock Exchange and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to AAMC's financial condition and performance, growth, operations, financial statements, business, products, markets, management,

earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of AAMC's securities would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

26.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of AAMC's securities by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme:  (i) deceived the investing public regarding AAMC's business, operations and management and the intrinsic value of AAMC's securities; (ii) allowed the Individual Defendants to siphon millions of dollars of "dividend" payments from the Company; and (iii) caused Plaintiffs and members of the Class to purchase AAMC securities at artificially inflated prices.

## IV.     BACKGROUND:  THE OCWEN-RELATED COMPANIES

27.     Defendant Erbey constructed a group of vertically-integrated and publicly-traded companies related to the mortgage servicing business in which he served as Chairman, and held significant, but varying ownership stakes in each of them (the "Ocwen-Related Companies"):

| Company | Ticker | Market | Erbey's Role | Erbey's Ownership[1] |
|---|---|---|---|---|
| **Altisource Asset Management Corp.** | AAMC | NYSE | Chairman | 28% |
| **Ocwen Financial Corporation** | OCN | NYSE | Chairman | 14% |
| **Altisource Portfolio Solutions** | ASPS | NASDAQ | Chairman | 29% |
| **Altisource Residential Corporation** | RESI | NYSE | Chairman | 4% |

[1] Ocwen Financial Corporation, 2014 Annual Report (Form 10-K), p. 110.

- 8 -

| Home Loan Servicing Solutions | HLSS | NASDAQ | Chairman | 1% |
| --- | --- | --- | --- | --- |

28.     Ocwen is the central business, describing itself as "a leader in the servicing industry," while the other Ocwen-Related Companies are in the business of either providing servicing-related business to Ocwen, foreclosing on distressed mortgages previously serviced by Ocwen, listing the foreclosed properties for sale, or managing the properties:  (1) as REOs or "Real Estate Owned" – a term referring to foreclosed homes held by for sale or rent by the mortgagor; or (2) as rental properties, among other related functions.  Each of the Ocwen-Related Companies had a different and specific function, and each provided its services to the other Ocwen-Related Companies, as set forth in the following chart:



## A.     Altisource Asset Management Corporation

29.     Defendant AAMC provides asset management and corporate governance services to Altisource Residential Corporation ("RESI"), including: (1) performing and administering RESI's day-to-day operations, (2) defining investment criteria in cooperation with RESI's Board of Directors, (3) sourcing, analyzing and executing asset acquisitions for RESI, including its acquisition of sub-performing and non-performing residential mortgage loan portfolios and related financing activities, (4) analyzing sales of properties, (5) overseeing Ocwen's servicing of RESI's residential mortgage loan portfolios, (6) overseeing Altisource's renovation, leasing and

property management of RESI's single-family rental properties, (7) performing asset management duties, and (8) performing corporate governance and other management functions, including financial, accounting, and tax management services.

30.     In exchange, AAMC received a quarterly incentive management fee of:

- 2% of all cash available for distribution by Residential to its stockholders and to [AAMC] as incentive management fees ("available cash") until the aggregate amount per share of available cash for the quarter, based on the average number of shares of Residential's common stock outstanding during the quarter ("quarterly per share distribution amount") exceeds $0.161; then

- 15% of all additional available cash for the quarter until the quarterly per share distribution amount exceeds $0.193; then

- 25% of all additional available cash for distribution by Residential for the quarter until the quarterly per share distribution amount exceeds $0.257; and thereafter

- 50% of all additional available cash for distribution by Residential for the quarter.[2]

## B.     Altisource Residential Corporation

31.     RESI is a Real Estate Investment Trust whose shares trade publicly on the NYSE under the ticker symbol "RESI."  RESI is focused on acquiring, owning and managing a large and diverse portfolio of single-family rental properties.  Instead of purchasing homes from willing sellers, RESI purchases portfolios of non-performing loans ("NPLs"), forecloses on certain of the houses underlying the NPLs, and retains many of these properties in its portfolio of single-family rental properties.  RESI's business strategy is premised on the idea that this foreclosure strategy allows it to obtain single family rental properties at an estimated 17% lower cost than market purchases of similar properties because it: 1) can purchase NPLs at a discount; and 2) does not have to pay realtor commissions or closing costs in acquiring the properties.

---

[2] Altisource Asset Management Corp., 2012 Annual Report (Form 10-K), at 3 (Feb. 7, 2013).

32.     Although RESI forecloses and retains the houses in a majority of the NPLs, it cannot do so in all instances.  In certain instances (approximately 15% of the NPLs), the borrower either brings his loan current or enters into a loan modification or refinancing transaction.  In other instances (up to 35% of the NPLs), RESI disposes of the underlying property in a short-sale or other transaction.  It also cannot foreclose on or dispose of the real estate immediately, and the process can take from 3 to 24 months.  In the interim, RESI must service the NPLs (collect the interest and principal payments from borrowers).

33.     RESI lacks any servicing capabilities, and contracts with Ocwen Financial Corporation to service its portfolio of NPLs during this interim period before it can seize the underlying property.  By its own admission, RESI would be dramatically impacted if Ocwen failed to adequately perform its servicing obligations.

34.     Similarly, RESI relies on Altisource Portfolio Solutions to provide services related to property management and renovation services, as well as for proprietary technology.

**C.     Ocwen Financial Corporation**

35.     Ocwen Financial Corporation ("Ocwen") is the fourth-largest servicer of mortgages in the U.S., and the largest non-bank servicer.  Through Ocwen's core residential servicing business, the Company purchases MSRs on subprime and other high-risk loans. Servicing involves the collection and remittance of principal and interest payments, the administration of escrow accounts, the collection of insurance claims, and the management of loans that are delinquent or in foreclosure. As part of its servicing operations, Ocwen evaluates loans for modification and foreclosure, and assists in the sale of properties following foreclosure.

36.     Ocwen also engages in subservicing activities (servicing loans on behalf of banks and other financial institutions that own the MSRs), and master servicing (collecting payments

- 11 -

from other mortgage servicers and distributing the funds to investors in mortgage-related securities).

37.     Ocwen holds itself out as specializing in servicing subprime and other high-risk non-prime mortgages, and thus many of the loans in its portfolio are considered non-performing, or delinquent (*i.e.*, the borrower has failed to make his or her scheduled payments).  As part of its servicing operations, Ocwen seeks to resolve delinquent loans through, *inter alia*, loan modifications, discounted payoffs, deeds-in-lieu of foreclosure and/or foreclosures.

38.     The amount of revenues Ocwen earns from its servicing business is a function of the Unpaid Principal Balances ("UPBs") of the loans it services.  Ocwen typically earns fees for its servicing operations as a percentage of UPB for its servicing and subservicing arrangements. Specifically, Ocwen disclosed in its 2013 Form 10-K that it generally earns annual fees "between 25 and 65 basis points of the average UPB of the loans serviced."  For its subservicing activities, Ocwen typically earns an annual fee "between 10 and 39 basis points of the average UPB, or on a per loan basis."  Per loan fees are typically varied based on delinquency status.

39.     The UPB of Ocwen's servicing portfolio increases when the Company obtains the right to service or subservice additional mortgages.  Conversely, UPB is reduced when homeowners make normal principal payments, refinance, or sell their homes and payoff their loans.

40.     Because Ocwen earns servicing fees as a percentage of the UPB of its MSRs and/or subservicing arrangements, increasing the size of Ocwen's portfolio of MSRs and/or subservicing arrangements was critical to growing the Company's revenues during the Class Period.  In fact, because UPB declines as homeowners make principal payments on their

- 12 -

mortgages, refinance, or pay-off their loans, some amount of growth in the size of its servicing portfolio is necessary just to prevent Ocwen's revenues from declining.

41.     Ocwen acknowledged in its public filings that its continued financial success was dependent upon the growth of its servicing portfolio.  For instance, Ocwen identified aggregate UPB as a variable that has a "significant effect on [its] operating results" in its 2013 Form 10-K, stating that because "[s]ervicing and subservicing fees are generally expressed as a percentage of UPB, . . . growth in the portfolio generally means growth in servicing and subservicing fees." Ocwen further noted in its 2013 Form 10-K that its "ability to maintain the size of [its] servicing portfolio depends on [its] ability to acquire the right to service or subservice additional pools of mortgage loans or to originate additional loans for which [it] retain[s] the MSRs."

**D.     Altisource Portfolio Solutions**

42.     Most of Altisource Portfolio Solution's ("Altisource") revenues are derived from services it provides to Ocwen.  Altisource's principal revenue source is mortgage servicing technologies – in essence mortgage servicing computer applications – that are leased by Ocwen. According to Altisource, "Ocwen, together with its subsidiaries, is our largest customer.  Our Chairman is also the Chairman of Ocwen.  Ocwen is contractually obligated to purchase certain mortgage services and technology services from us through August 2025 under the terms of a master services agreement and amendments to the master services agreement."[3]  Specifically, Altisource provides its REALServicing platform to Ocwen, which Ocwen uses to determine whether resolving non-performing loans through modification, deed-in-lieu of foreclosure or foreclosure will optimize the net present value of a loan.

---

[3] Altisource Portfolio Solutions, S.A., 2013 Annual Report (Form 10-K), at 58 (Feb. 13, 2014).

43.     When Ocwen determines, through its use of Altisource's REALServicing platform, to foreclose on a loan, Altisource steps in to provide an array of foreclosure-related services, including asset management, insurance services, residential property valuation, default management services, and origination management services. Altisource's asset management operations involve services such as REO asset management, title insurance, property preservation, and operation of the Hubzu consumer real estate portal.

**E.      Home Loan Servicing Solutions**

44.     The primary objective of Home Loan Servicing Solutions ("HLSS") is the acquisition of mortgage servicing rights and related servicing advances and other residential mortgage related assets.[4]  HLSS primarily acquires Mortgage Servicing Rights ("MSRs") from Ocwen and then contracts with Ocwen to service the loans.  In addition, Ocwen and HLSS have agreed to provide each other with professional services, including "valuation and analysis of mortgage servicing rights, capital markets activities, advance financing management, treasury management, legal services and other similar services."[5]

**V.      AAMC'S CONTINUED SUCCESS WAS DEPENDENT UPON OCWEN'S ABILITY TO PROPERLY PERFORM ITS SERVICING OBLIGATIONS**

45.     AAMC acknowledged that its possibility for future success was directly tied to the success of RESI:

> Residential is currently our primary source of revenue and will drive our potential future growth.  The asset management agreement with Residential entitles us to "incentive management fees," that give us a share of Residential's cash flow available for distribution to its stockholders as Residential grows, as well as reimbursement for certain overhead and operating expenses.

---

[4] Home Loan Servicing Solutions, Ltd., 2013 Annual Report (Form 10-K), at 3 (Feb. 6, 2014).

[5] *Id*. at 8.

> Accordingly, our operating results are highly dependent on
> Residential's ability to achieve positive operating results.[6]

46.     AAMC further elaborated that RESI's business, and thus AAMC's revenues,

depend on a "steady supply" of NPLs that can be converted to a portfolio of rental properties

through foreclosure:

> Residential's business model is dependent on the acquisition of a
> steady supply of sub-performing and nonperforming loans, the
> success of its loan modification and other resolution efforts and the
> conversion of a significant portion of those loans to REO.[7]

47.     RESI purchased a significant amount of its NPLs from Ocwen.  If Ocwen's

growth were to be curtailed, including by regulatory action, it could disrupt the "steady supply"

of NPLs required by RESI.

48.     AAMC additionally disclosed that RESI's failure to comply with applicable

regulations (including regulations relating to loan serving) could adversely affect AAMC:

> Residential may be, or may become, subject to the regulation of
> various states, including licensing requirements and consumer
> protection statutes.  Residential's failure to comply with any such
> laws, if applicable to it, would adversely affect its ability to
> implement its business strategy, which could materially and
> adversely affect Residential.  If these risks are realized by
> Residential, our ability to generate incentive management fees
> would be harmed and our results of operations and financial
> condition could be materially and adversely affected.[8]

49.     AAMC acknowledged that the failure of Ocwen to effectively perform its

servicing obligations would directly impact RESI, and by extension, AAMC:

---

[6] Altisource Asset Management Corp., 2013 Annual Report (Form 10-K), at 1, 17, 40, F-6 (Feb. 20, 2014).

[7] *Id*. at 19.

[8] *Id*. at 20.

> **Failure of Ocwen to effectively perform its servicing obligations under the Ocwen servicing agreement could have an adverse effect on Residential.**
>
> Residential is contractually obligated to service the residential mortgage loans that it acquires.  Residential does not have any employees, servicing platform, licenses or technical resources necessary to service its acquired loans.  Consequently, Residential has engaged Ocwen to service the non-performing and sub-performing and non-performing loans it acquires.  If for any reason Ocwen is unable to service these loans at the level and/or the cost that Residential anticipates, or if Residential fails to pay Ocwen or otherwise defaults under the Ocwen servicing agreement, and Ocwen ceases to act as its servicer, an alternate servicer may not be readily available on favorable terms, or at all, which could have a material adverse effect on Residential.[9]

50.    Accordingly, any regulatory action curtailing the ability of Ocwen to obtain substantial quantities of new MSRs or the inability of Ocwen to competently service MSRs could have a material adverse impact on RESI, and thus on AAMC.

## VI.    OMISSIONS OF MATERIAL FACT PRIOR TO AND THROUGHOUT THE CLASS PERIOD

**A.    Ocwen's Serving Platform Was Materially Flawed**

51.    As would ultimately be revealed by the NYDFS in a December 22, 2014 press release, Ocwen's servicing platform consisted of "inadequate and ineffective information technology systems and personnel."  This defective platform caused numerous regulatory violations (at least three per foreclosed loan), and resulted in:  (1) borrowers getting backdated letters; (2) Ocwen disseminating false information to borrowers; (3) Ocwen maintaining inaccurate records; and (4) failing to confirm the right to foreclosure prior to instituting proceedings.

---

[9] *Id*. at 32.

52.   Ocwen's servicing platform was so defective that, by late 2014, the NYDFS refused to allow the company to purchase additional MSRs.

**B.   Transactions Between the Ocwen-Related Companies Suffered From Serious Conflicts of Interest**

53.   Despite AAMC's claims that it maintained strict conflict of interest procedures, the December 22, 2014 press release from the NYDFS disclosed how it had uncovered a number of conflicts of interest between the Ocwen-Related Companies, including the failure of Defendant Erbey to recuse himself from decision-making with regard to transactions between the Ocwen-Related Companies.  The NYDFS specifically determined that Defendant Erbey had participated in the approval of a number of transactions between Ocwen and Altisource.

54.   Ocwen's lack of controls over related-party transactions exacerbated its severe compliance deficiencies, including:  a) payment of unreasonably high incentive management fees to AAMC by RESI; b) Ocwen's Chief Risk Officer and other senior managers being simultaneously employed by Altisource; c) Ocwen paying above-market rates to Altisource for Hubzu listings; and d) a force-placed insurance transaction that funneled $65 million annually from Ocwen to Altisource.

**a.   AAMC's management fee was unreasonably high and unsustainable.**

55.   As described above, Defendant Erbey owned 4% of the shares of RESI, and 28% of the shares of AAMC.  Accordingly, for every dollar of profit that he could shift from RESI to AAMC, Erbey would personally benefit by $0.24.

56.   A research report issued by the GLAUCUS RESEARCH GROUP on March 19, 2014, opined that the management fee charged by AAMC to RESI was between four and seven times higher than other similarly situated asset managers:

We believe that AAMC's Incentive Fee is at **least four to seven times higher than the compensation received by similarly situated asset managers**, and as such, is a sweetheart deal that will unjustly enrich insiders with a beneficial stake in AAMC at the expense of RESI's shareholders.

* * *

Because AAMC's executive team owns far more equity in AAMC than RESI, AAMC's management team **is financially incentivized to generate large management fees at the expense of RESI shareholders**.

57.     The Glaucus Report further opined that the disclosure of AAMC's management fee in its SEC filings and elsewhere was materially misleading because it was calculated by an opaque methodology, making it hard to model.  As evidence of this conclusion, Glaucus cited the fact that Wall Street estimates underestimated the fee by 454% in Q4 2013.

### b.     Ocwen's Chief Risk Officer and other senior managers were simultaneously employed by Altisource.

58.     As described in a February 26, 2014 Letter, the NYDFS Monitor also discovered that – contrary to Ocwen's representations that it had "robust" systems in place to manage potential conflicts between Ocwen and the Erbey Companies – Altisource's Chief Risk Officer, S.P. Ravi, was simultaneously serving as *Ocwen's* Chief Risk Officer and "reported directly to Mr. Erbey in *both* capacities."  In addition, while Ravi's salary was paid by Ocwen, Ravi did not know whether Ocwen or Altisource paid the salaries of his risk management staff, which also provided services to both Ocwen and Altisource.

59.     As noted by the NYDFS in the February 26, 2014 Letter, these employees' dual roles at Ocwen and Altisource "raise[] the possibility that management has the opportunity and incentive to make decisions concerning Ocwen that are intended to benefit the share price of affiliated companies, resulting in harm to borrowers, mortgage investors, or Ocwen's

- 18 -

shareholders as a result." Moreover, Ocwen's failure to disclose the dual roles played by Ravi and other executives (and the inherent conflicts they presented) further undermine the Company's representations that it had "robust" controls in place to ensure the fairness of its related-party transactions.

        **c.**        **Ocwen pays above-market rates to Altisource for Hubzu listings.**

60.    As revealed by the NYDFS in an April 21, 2014 Letter to Ocwen, during the course of its investigation, the Monitor also uncovered the fact that Altisource's Hubzu portal (Ocwen's principal online auction site for the sale of foreclosures) charged Ocwen a fee *up to three times* higher than the fees Hubzu charged to non-Ocwen customers:

> In other words, when Ocwen selects its affiliate Hubzu to host foreclosure or short sale auctions on behalf of mortgage investors and borrowers, the Hubzu auction fee is 4.5%; when Hubzu is competing for auction business on the open market, its fee is as low as 1.5%. These higher fees, of course, ultimately get passed onto the investors and struggling borrowers who are typically trying to mitigate their losses and are not involved in the selection of Hubzu as the host site.

        **d.**        **Defendant Erbey directly approved a force-placed insurance transaction that funneled $65 million annually from Ocwen to Altisource.**

61.    The Monitor also uncovered that Defendant Erbey had, in fact, approved an agreement between Ocwen and a third-party insurance agent, SWBC, which had the effect of funneling over $65 million in annual fees from Ocwen to Altisource "for doing very little work."

## VII. FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

62.    Throughout the Class Period, in regular press releases, conference calls and filings with the SEC, AAMC and the Individual Defendants repeatedly made false and misleading statements and omissions concerning the Company's business practices, including the propriety of the transactions that AAMC entered into with Residential, Ocwen and the other

Ocwen-Related Companies, which created a false impression concerning AAMC's financial and operational status and future growth prospects.

   63. The Class Period begins on April 19, 2013, when AAMC issued a proxy statement for its annual shareholders' meeting (the "Proxy").  The Proxy described a policy that AAMC's board of directors had adopted to approve transactions with the Ocwen-Related Companies:

> **Related Party Transaction Policy**
>
> *Our Board of Directors has adopted a policy and procedure for review, approval and monitoring of transactions involving us and related persons (directors and named executive officers or their immediate family members or stockholders owning greater than 5% or greater of our outstanding stock)* within our written Code of Business Conduct and Ethics which is available at www.altisourceresi.com.  This policy and procedure is not limited to related person transactions that meet the threshold for disclosure under the relevant SEC rules, as it broadly covers any situation in which a conflict of interest may arise.
>
> Any situation that potentially qualifies as a conflict of interest is to be immediately disclosed to the General Counsel to assess the nature and extent of any concern as well as the appropriate next steps.  The General Counsel will notify the Chairman of the Board if any such situation requires approval of the Board of Directors and related persons are required to obtain the prior written approval of the Audit Committee of the Board of Directors before participating in any transaction or situation that may pose a conflict of interest.  In considering a transaction, the Audit Committee will consider all relevant factors including (1) whether the transaction is in the best interests of Residential; (ii) alternatives to the related person transaction; whether the transaction is on terms comparable to those available to third parties; the potential for the transaction to lead to an actual or apparent conflict of interest and any safeguards imposed to prevent such actual or apparent conflict; and the overall fairness of the transaction to Residential.  The Audit Committee will periodically monitor any approved transactions to ensure that there are no changed circumstances that would render it advisable for Residential to amend or terminate the transaction.

64.     This disclosure was materially false and misleading when made because it omitted to disclose:  (i) the true nature of the relationship between the Ocwen-Related Parties; (ii) that the transactions that took place between the Ocwen-Related Parties were the result of an unfair process from which Defendant Erbey failed to recuse himself, despite his admittedly conflicted interests; (iii) that this unfair process resulted in unreasonably large incentive management fees from RESI that distorted the financial results of the Company; and (iv) that as a result of the foregoing, the Company's disclosures concerning its transactions with RESI did not provide a fair presentation of the Company's finances, operations and future prospects, including the Company's future growth and material trends.  Accordingly, the Company's statements regarding its net income, incentive management fees and receipt of expense reimbursements were materially false and misleading at all relevant times and lacked in any reasonable basis when made.

65.     On May 9, 2013, AAMC issued a press release over GLOBENEWSWIRE announcing its financial results for Q1 2013.  On the same day, AAMC filed its quarterly report for the period ended March 31, 2013, on Form 10-Q (the "Q1 2013 Form 10-Q") with the SEC that was signed by Defendant Najour.  The Q1 2013 Form 10-Q specifically identified AAMC's receipt of expense reimbursements of $895,000.  This press release and the Q1 2013 Form 10-Q were materially false and misleading in that they omitted to disclose:  (i) the true nature of the relationship between the Ocwen-Related Parties; (ii) that the transactions that took place between the Ocwen-Related Parties were the result of an unfair process from which Defendant Erbey failed to recuse himself, despite his admittedly conflicted interests; and (iii) that the unfair process led to transactions between the Ocwen-Related Parties that were not "arms-length" transactions and resulted in certain transactions that were:  a) materially unfair to certain of the

Ocwen-Related Companies; and/or b) resulted in Ocwen being incentivized to, and in fact violating various state and federal laws protecting consumers in mortgage serving transactions; and (iv) that Ocwen's violation of consumer protection laws was likely to have a detrimental future impact on AAMC.

66.     This press release and the Q1 2013 Form 10-Q were also materially false and misleading in that they omitted to disclose:  (i) that the unfair process in approving related-party transactions resulted in unreasonably large incentive management fees from RESI that distorted the financial results of the Company; and (ii) that as a result of the foregoing, the Company's disclosures concerning its transactions with RESI did not provide a fair presentation of the Company's finances, operations and future prospects, including the Company's future growth and material trends.  Accordingly, the Company's statements regarding its net income, incentive management fees and receipt of expense reimbursements were materially false and misleading at all relevant times and lacked in any reasonable basis when made.

67.     Also on May 9, 2013, AAMC held its Q1 2013 earnings conference call, hosted by Defendants Erbey, Pandey, and Najour.  Defendant Erbey began the call by describing AAMC's business strategy:

> The key to our model is the existing operating infrastructure of our partners where Ocwen provides the non-performing loan servicing to Residential and Altisource provides renovation, leasing and property management services to Residential.

This disclosure by Defendant Erbey was materially false and misleading in that it omitted to disclose that Ocwen's servicing platform was materially flawed, a fact that was likely to lead to regulatory action that would have a material negative impact on AAMC's financial results and operations.

- 22 -

68.     These positive disclosures on May 9, 2013, caused AAMC shares to climb from a closing price of $231.00 on May 8, 2013, to close at $259.90 per share on May 9, 2013 – a gain of 12.51%.

69.     On July 23, 2013, AAMC issued a press release over the GLOBAL NEWSWIRE announcing its financial results for the second quarter of 2013. This press release was also filed as an exhibit to the Form 8-K filed with the SEC on this same date.  This press release disclosed that AAMC had experienced a net loss for the second quarter of $1.5 million.

70.     On the same day, the Company filed its quarterly report for the period ended June 30, 2013 on Form 10-Q (the "Q2 2013 Form 10-Q") with the SEC that was signed by Defendant Najour.  The Q2 2013 Form 10-K disclosed that AAMC had experienced a net loss for the second quarter of $1.5 million, including expense reimbursements of $1.2 million.

71.     The July 23, 2013 press release and the Q2 2013 Form 10-Q were materially false and misleading in that they omitted to disclose:  (i) the true nature of the relationship between the Ocwen-Related Parties; (ii) that the transactions that took place between the Ocwen-Related Parties were the result of an unfair process from which Defendant Erbey failed to recuse himself, despite his admittedly conflicted interests; and (iii) that the unfair process led to transactions between the Ocwen-Related Parties that were not "arms-length" transactions and resulted in certain transactions that were:  a) materially unfair to certain of the Ocwen-Related Companies; and/or b) resulted in Ocwen being incentivized to, and in fact violating various state and federal laws protecting consumers in mortgage serving transactions; and (iv) that Ocwen's violation of consumer protection laws was likely to have a detrimental future impact on AAMC.

72.     The July 23, 2013 press release and the Q2 2013 Form 10-Q were also materially false and misleading in that they omitted to disclose:  (i) that the unfair process in approving

- 23 -

related-party transactions resulted in unreasonably large incentive management fees from RESI that distorted the financial results of the Company; and (ii) that as a result of the foregoing, the Company's disclosures concerning its transactions with RESI did not provide a fair presentation of the Company's finances, operations and future prospects, including the Company's future growth and material trends.

Accordingly, the Company's statements regarding its net income, incentive management fees and receipt of expense reimbursements were materially false and misleading at all relevant times and lacked in any reasonable basis when made.

73.     In response to these positive disclosures on July 23, 2013, AAMC shares climbed from a close of $300.00 per share on July 22, 2013 to close at $325.00 per share on July 23, 2013 – a gain of $25.00 per share, or 8.3%.

74.     On September 12, 2013, AAMC shares commenced trading on the NYSE MKT.

75.     On October 22, 2013, AAMC issued a press release over the GLOBAL NEWSWIRE announcing its financial results for the third quarter of 2013.  This press release, which was also attached as an exhibit to the Form 8-K filed with the SEC on the same date, stated in pertinent part that AAMC had experienced a net loss for the quarter of $2.6 million and "earned incentive management fees from Residential of $51,000 based on Residential's payment of a dividend of $0.10 to its stockholders."  On the same day, the Company filed its quarterly report for the third quarter of 2013 on Form 10-Q (the "Q3 2013 Form 10-Q") with the SEC, which was signed by Defendant Najour.  The Q3 2013 Form 10-Q contained the same financial information as the October 22, 2013 press release.  This positive news caused AAMC shares to climb from $522.00 per share to close trading at $600.00 per share on October 22, 2013.

76.     The October 22, 2013 press release and the Q3 2013 Form 10-Q were materially false and misleading in that they omitted to disclose:  (i) the true nature of the relationship between the Ocwen-Related Parties; (ii) that the transactions that took place between the Ocwen-Related Parties were the result of an unfair process from which Defendant Erbey failed to recuse himself, despite his admittedly conflicted interests; and (iii) that the unfair process led to transactions between the Ocwen-Related Parties that were not "arms-length" transactions and resulted in certain transactions that were:  a) materially unfair to certain of the Ocwen-Related Companies; and/or b) resulted in Ocwen being incentivized to, and in fact violating various state and federal laws protecting consumers in mortgage serving transactions; and (iv) that Ocwen's violation of consumer protection laws was likely to have a detrimental future impact on AAMC.

77.     The October 22, 2013 press release and the Q3 2013 Form 10-Q were materially false and misleading in that they omitted to disclose:  (i) that the unfair process in approving related-party transactions resulted in unreasonably large incentive management fees from RESI that distorted the financial results of the Company; and (ii) that as a result of the foregoing, the Company's disclosures concerning its transactions with RESI did not provide a fair presentation of the Company's finances, operations, and future prospects, including the Company's future growth and material trends.

Accordingly, the Company's statements regarding its net income, incentive management fees and receipt of expense reimbursements were materially false and misleading at all relevant times and lacked in any reasonable basis when made.

78.     On December 3, 2013, Ocwen disseminated an investor presentation, including filing it as an Exhibit to a Form 8-K with the SEC.  This presentation bore the logos of each of the Ocwen-Related Companies and described the benefits of Ocwen having created what it

- 25 -

called "strategic allies" (*i.e.*, the Ocwen-Related Companies).  The presentation disclosed that the "Strategic Allies have sound Corporate Governance," and that:

- each had "separate Boards and separate management,"

- there were "Robust Related Party Transaction Approval Policies" in place; and

- they maintained "Transparency in inter-company relationships through public company disclosures."

This disclosure was materially false and misleading in that it both falsely described the corporate governance policies of the Ocwen-Related Companies and omitted to disclose:  (i) the true nature of the relationship between the Ocwen-Related Parties; (ii) that the transactions that took place between the Ocwen-Related Parties were the result of an unfair process from which Defendant Erbey failed to recuse himself, despite his admittedly conflicted interests; and (iii) that the unfair process led to transactions between the Ocwen-Related Parties that were not "arms-length" transactions and resulted in certain transactions that were:  a) materially unfair to certain of the Ocwen-Related Companies; and/or b) resulted in Ocwen being incentivized to, and in fact violating various state and federal laws protecting consumers in mortgage serving transactions; and (iv) that Ocwen's violation of consumer protection laws was likely to have a detrimental future impact on AAMC.  As a result, these disclosures concerning its transactions with the Ocwen-Related Companies did not provide a fair presentation of the Company's finances and operations, and lacked in any reasonable basis when made.

79.    Speaking at the investor conference on December 3, 2013, Defendant Erbey described the relationship between the Ocwen-Related Companies, specifically stating that he wanted to "stress first of all that *these companies are not affiliates, that they are independent companies*. They have independent boards and they have management teams."  He went on to

assure investors that "each company has its own separate Board of Directors, the majority of whom are independent, and *we have robust related party transaction approval process. Any related-party transactions between the companies I actually recuse myself from that decision*." This disclosure was materially false and misleading in that it both falsely described the corporate governance policies of the Ocwen-Related Companies and omitted to disclose: (i) the true nature of the relationship between the Ocwen-Related Parties; (ii) that the transactions that took place between the Ocwen-Related Parties were the result of an unfair process from which Defendant Erbey failed to recuse himself, despite his admittedly conflicted interests; and (iii) that the unfair process led to transactions between the Ocwen-Related Parties that were not "arms-length" transactions and resulted in certain transactions that were:  a) materially unfair to certain of the Ocwen-Related Companies; and/or b) resulted in Ocwen being incentivized to, and in fact violating various state and federal laws protecting consumers in mortgage serving transactions; and (iv) that Ocwen's violation of consumer protection laws was likely to have a detrimental future impact on AAMC.  As a result, the Company's disclosures concerning its transactions with the Ocwen-Related Companies did not provide a fair presentation of the Company's finances and operations, and lacked in any reasonable basis when made.

80.     The favorable news disseminated on December 3, 2013, caused AAMC shares to increase in value from a close of $790.00 on December 2, 2013, to a close of $885.00, an increase of 12.0%.

81.     On December 19, 2013, BLOOMBERG NEWS reported that Ocwen had agreed to a $2.1 billion settlement with the Consumer Financial Protection Bureau (the "CFPB").  The CFPB provided the details of this settlement in a press release of the same date, with Richard Cordray, head of the CFPB commenting that "Ocwen violated federal consumer financial laws at

- 27 -

every stage of the mortgage servicing process." In response, AAMC shares declined from a closing price of $995.50 per share on December 18, 2013, to $918.53 per share on December 19, 2013 and to $860.85 on December 20, 2013, for a two-day decline of $134.65 per share, or 13.5%.

82.    On February 6, 2014, Ocwen disclosed that the NYDFS had placed "an indefinite hold" on its agreement to purchase of $39 billion in MSRs from Wells Fargo due to "concerns about Ocwen's servicing portfolio growth." The NYDFS's halt to the Wells Fargo transaction revealed that the NYDFS had identified ongoing compliance problems at Ocwen. AAMC's share price declined 3.9% in response to this news, from a close of $936.90 on February 5, 2014, to $900.77 on February 6, 2014.

83.    On February 26, 2014, the potential ongoing compliance problems suggested by the NYDFS's February 6, 2014, hold on the Wells Fargo transaction were revealed in a public letter issued by NYDFS. In the February 26, 2014 Letter, the NYDFS disclosed that it had uncovered serious potential conflicts of interest between the Ocwen-Related Companies:

> . . . we uncovered these potential conflicts between and among Ocwen, Altisource Portfolio Solutions, S.A. ("Altisource Portfolio"), Altisource Residential Corporation, Altisource Asset Management Corporation, and Home Loan Servicing Solutions, Ltd. (together, the "affiliated companies"), all of which are chaired by William C. Erbey, who is also the largest shareholder of each and the Executive Chairman of Ocwen.
>
> *   *   *
>
> Presently, Ocwen's management owns stock or stock options in the affiliated companies. This raises the possibility that management has the opportunity and incentive to make decisions concerning Ocwen that are intended to benefit the share price of affiliated companies, resulting in harm to borrowers, mortgage investors, or Ocwen shareholders as a result.

- 28 -

AAMC's share price declined $144.99 per share in response to these disclosures from the

NYDFS, or more than 15.8%, from a close of $916.99 on February 25, 2014, to close at $772.00

per share on February 26, 2014.

84.     On February 20, 2014 AAMC announced its financial results for the fourth

quarter of 2013 and fiscal year 2013 in a press release distributed over the GLOBENEWSWIRE.

This press release was also filed as an exhibit to the Form 8-K filed with the SEC on the same

date, stated in pertinent part that AAMC had experienced a net loss for the quarter of

$0.4 million and of $5.2 million for the year.  This press release disclosed that, for the quarter,

AAMC had "generated positive adjusted earnings for the quarter of $4.0 million" and "earned

incentive management fees from RESI of $4.8 million."  Commenting on these results,

Defendant Erbey continued, "We are proud of our implementation of Residential's differentiated

business plan.  We believe that, with AAMC's guidance, Residential successfully delivered on

every critical aspect of its business model in 2013.  I am pleased with what we have been able to

accomplish for Residential and for our shareholders in our first full year of operations."

85.     Also on February 20, 2014, Defendant AAMC filed its annual report for 2013

with the SEC on Form 10-K (the "2013 Form 10-K").  The Form 10-K was signed by

Defendants Erbey, Pandey, and Najour.  The 2013 Form 10-K disclosed that AAMC had

suffered a loss of $5.2 million for 2013, a Management Incentive Fee of $4.9 million, and

expense reimbursement of $5.4 million.

86.     These quoted portions of the February 20, 2014 press release and the 2013 Form

10-K were materially false and misleading in that they omitted to disclose:  (i) the true nature of

the relationship between the Ocwen-Related Parties; (ii) that the transactions that took place

between the Ocwen-Related Parties were the result of an unfair process from which Defendant

Erbey failed to recuse himself, despite his admittedly conflicted interests; and (iii) that the unfair process led to transactions between the Ocwen-Related Parties that were not "arms-length" transactions and resulted in certain transactions that were:  a) materially unfair to certain of the Ocwen-Related Companies; and/or b) resulted in Ocwen being incentivized to, and in fact violating various state and federal laws protecting consumers in mortgage serving transactions; and (iv) that Ocwen's violation of consumer protection laws was likely to have a detrimental future impact on AAMC.

87.     The February 20, 2014 press release and the 2013 Form 10-K were also materially false and misleading in that they omitted to disclose:  (i) that the unfair process in approving related-party transactions resulted in unreasonably large incentive management fees from RESI that distorted the financial results of the Company; and (ii) that as a result of the foregoing, the Company's disclosures concerning its transactions with RESI did not provide a fair presentation of the Company's finances, operations, and future prospects, including the Company's future growth and material trends.

Accordingly, the Company's statements regarding its net income, incentive management fees and receipt of expense reimbursements were materially false and misleading at all relevant times and lacked in any reasonable basis when made.

88.     This Form 10-K identified potential conflicts of interest in transactions with Ocwen-Related Companies as a "risk factor," but stressed the policies and procedures that AAMC promised to follow to mitigate the potential problems that could arise from such conflicts:

> We follow policies, procedures and practices to avoid potential
> conflicts with respect to our dealings with Altisource, Ocwen and
> Residential, including our Chairman recusing himself from

negotiations regarding, and approvals of, transactions with these entities (or where necessary, certain of our officers recusing themselves from discussions on, and approvals of transactions with Residential.  We also manage potential conflicts of interest through oversight by independent members of our Board of Directors (independent directors constitute a majority of our Board of Directors), and we will also seek to manage these potential conflicts through dispute resolution and other provisions of our agreements with Altisource, Ocwen and Residential. (emphasis added).[10]

89.     This disclosure was materially false and misleading in that it both falsely described the corporate governance policies of the Ocwen-Related Companies and omitted to disclose:  (i) the true nature of the relationship between the Ocwen-Related Parties; (ii) that the transactions that took place between the Ocwen-Related Parties were the result of an unfair process from which Defendant Erbey failed to recuse himself, despite his admittedly conflicted interests; and (iii) that the unfair process led to transactions between the Ocwen-Related Parties that were not "arms-length" transactions and resulted in certain transactions that were:  a) materially unfair to certain of the Ocwen-Related Companies; and/or b) resulted in Ocwen being incentivized to, and in fact violating various state and federal laws protecting consumers in mortgage serving transactions; and (iv) that Ocwen's violation of consumer protection laws was likely to have a detrimental future impact on AAMC.

90.     The 2013 Form 10-K also falsely maintained that AAMC's business could not be materially impacted by any governmental regulations:

**Governmental Regulations**

We do not believe there are any governmental regulations that will materially affect the conduct of our business.[11]

_____

[10] Altisource Asset Management Corp., 2013 Annual Report (Form 10-K), p. 32.

[11] Altisource Asset Management Corp., 2013 Annual Report (Form 10-K), p. 13.

This disclosure was materially false and misleading when made in that Ocwen (which provided loan servicing for RESI) was subject to governmental regulation, including federal law and the laws of New York and California, which could affect the conduct of Ocwen's business, and by extension, the conduct of AAMC's business.

91.     The 2013 Form 10-K also acknowledged that RESI (and by extension AAMC) was entirely dependent on the servicing capabilities of Ocwen to implement its business strategies:

> We believe that Residential's 15-year servicing agreement with Ocwen will allow Residential to acquire a high volume of non-performing mortgage loans due to Ocwen's established distressed mortgage loan servicing techniques and platforms. Through the relationship with Ocwen, Residential employs various loan resolution methodologies with respect to its residential mortgage loans, including loan modification, collateral resolution and collateral disposition.[12]

92.     The Defendants sought to calm market fears of this risk factor by falsely maintaining that Ocwen's servicing capabilities were "superior":

> **Residential's Strengths**
>
> **Relationship with Ocwen and Proven Loan Resolution Methodologies**
>
> We intend to capitalize on the servicing capabilities of Ocwen, which we view as superior relative to other servicers in terms of cost, management experience, technology infrastructure and platform scalability. Ocwen services Residential's acquired residential mortgage loan portfolios in accordance with the terms of their servicing agreement with Residential. Ocwen's servicing approach is focused on the psychological principles influencing borrower behavior and uses non-linear optimization models for deciding the best resolution for a loan. Ocwen's use of artificial intelligence and dialogue engines seeks to remove variability and human error from the process and provides scalability. Ocwen is a

---

[12] Altisource Asset Management Corp., 2013 Annual Report (Form 10-K), p. 4.

leader in its ability to convert loans that are 90 days or more past
due to current status.[13]

93.     These disclosures were materially false and misleading when made because

Ocwen's serving platform and systems were materially flawed, as described above.

94.      On April 21, 2014, the NYDFS publicly disclosed its Monitor's finding that the

relationship between certain Ocwen-Related Companies "raises significant concerns regarding

self-dealing."  This letter requested additional information from Ocwen regarding these conflicts

of interest.

95.     On April 29, 2014 AAMC announced its financial results for the first quarter of

2014 in a press release issued over the GLOBAL NEWSWIRE.  This press release was also filed as

an exhibit to a Form 8-K filed with the SEC on the same date.  This press release disclosed that

AAMC had earned net income of $7.2 million for the first quarter of 2013, thus achieving the

first quarter of positive net income since inception."   Commenting on the results, Defendant

Pandey stated that "We expect Residential's improved loan resolutions will have a meaningful

impact on the growth of Residential's loan portfolio," and Defendant Erbey similarly noted that

"Under the management of AAMC, Residential has been able to pay an increased dividend for

the second consecutive quarter."

96.     Also on April 29, 2014, AAMC filed its quarterly report for the first quarter of

2014 on Form 10-Q with the SEC (the "Q1 2014 Form 10-Q"), which was signed by Defendant

Najour.  The Q1 2014 Form 10-Q reported net income of $7.2 million for the quarter, including a

Management Incentive Fee from RESI of $10.9 million.

---

[13] Altisource Asset Management Corp., 2013 Annual Report (Form 10-K), p. 9.

- 33 -

97.     The April 29, 2014 press release and the Q1 2014 Form 10-Q were materially false and misleading in that they omitted to disclose:  (i) the true nature of the relationship between the Ocwen-Related Parties; (ii) that the transactions that took place between the Ocwen-Related Parties were the result of an unfair process from which Defendant Erbey failed to recuse himself, despite his admittedly conflicted interests; and (iii) that the unfair process led to transactions between the Ocwen-Related Parties that were not "arms-length" transactions and resulted in certain transactions that were:  a) materially unfair to certain of the Ocwen-Related Companies; and/or b) resulted in Ocwen being incentivized to, and in fact violating various state and federal laws protecting consumers in mortgage serving transactions; and (iv) that Ocwen's violation of consumer protection laws was likely to have a detrimental future impact on AAMC.

98.     The April 29, 2014 press release and the Q1 2014 Form 10-Q were also materially false and misleading in that they omitted to disclose:  (i) that the unfair process in approving related-party transactions resulted in unreasonably large incentive management fees from RESI that distorted the financial results of the Company; and (ii) that as a result of the foregoing, the Company's disclosures concerning its transactions with RESI did not provide a fair presentation of the Company's finances, operations, and future prospects, including the Company's future growth and material trends.

Accordingly, the Company's statements regarding its net income, incentive management fees and receipt of expense reimbursements were materially false and misleading at all relevant times and lacked in any reasonable basis when made.

99.     On June 23, 2014, RESI was shut out of a distressed loan auction conducted by the U.S. Department of Housing and Urban Development.  In response to this unexpected bad

news, AAMC shares dropped 25.4%, from a closing price of $1,099.02 per share on June 20, 2014, to a closing price of $819.90 per share on June 23, 2014.

100. On July 22, 2014, AAMC announced its financial results for the second quarter of 2014 over the GLOBAL NEWSWIRE. This press release, also filed as an exhibit to the Form 8-K filed on the same date with the SEC, disclosed that AAMC had earned net income of $12.2 million and "generated management incentive fees of $13.7 million."

101. On the same day, the Company filed its quarterly report for the second quarter of 2014 on Form 10-Q with the SEC (the "Q2 2014 Form 10-Q") signed by Defendant Najour. The Q2 2014 Form 10-Q reported net income of $13.1 million for the quarter, including a Management Incentive Fee from RESI in the amount of $13.7 million.

102. The July 22, 2014 press release and the Q2 2014 Form 10-Q were materially false and misleading in that they omitted to disclose:  (i) the true nature of the relationship between the Ocwen-Related Parties; (ii) that the transactions that took place between the Ocwen-Related Parties were the result of an unfair process from which Defendant Erbey failed to recuse himself, despite his admittedly conflicted interests; and (iii) that the unfair process led to transactions between the Ocwen-Related Parties that were not "arms-length" transactions and resulted in certain transactions that were: a) materially unfair to certain of the Ocwen-Related Companies; and/or b) resulted in Ocwen being incentivized to, and in fact violating various state and federal laws protecting consumers in mortgage serving transactions; and (iv) that Ocwen's violation of consumer protection laws was likely to have a detrimental future impact on AAMC.

103. The July 22, 2014 press release and the Q2 2014 Form 10-Q were further materially false and misleading in that they omitted to disclose:  (i) that the unfair process in approving related-party transactions resulted in unreasonably large incentive management fees

- 35 -

from RESI that distorted the financial results of the Company; and (ii) that as a result of the foregoing, the Company's disclosures concerning its transactions with RESI did not provide a fair presentation of the Company's finances, operations, and future prospects, including the Company's future growth and material trends.

Accordingly, the Company's statements regarding its net income, incentive management fees and receipt of expense reimbursements were materially false and misleading at all relevant times and lacked in any reasonable basis when made.

104.    On July 31, 2014, Ocwen reported a sizable earnings miss for its second fiscal quarter, which it blamed on a host of regulatory issues that continued to plague it.  In response to this news, AAMC's stock price fell from $699.70 per share to $613.02 per share, a loss of 12.4%, reflecting investors' concern that the regulatory pressure on Ocwen related to the extensive ties among the Ocwen-Related Companies.

105.    On August 4, 2014, BLOOMBERG NEWS reported that the NYDFS had sent Ocwen a letter criticizing a related-party transaction between Ocwen and Altisource which it contended "appears designed to funnel as much as $65 million in fees annually from already distressed homeowners to Altisource for minimal work."  This letter, which was also publicly disclosed in its entirety by the NYDFS, revealed evidence indicating that "Ocwen hired Altisource to design Ocwen's new force-placed program with the expectation and intent that Altisource would use this opportunity to steer profits to itself."  According to the NYDFS, "the role that Ocwen's Executive Chairman William C. Erbey played in approving this arrangement appears to be inconsistent with public statements Ocwen has made, as well as representations in company SEC filings."  In response, AAMC's share price fell from a close of $580.00 on August 1, 2014, to close at $548.24 on August 4, 2014 – a decline of 5.48%.

- 36 -

106.    On October 21, 2014, the NYDFS disclosed in a publicly-available letter that it had "uncovered serious issues with Ocwen's systems and processes, including Ocwen's backdating of potentially hundreds of thousands of letters to borrowers," in violation of the Company's legal and regulatory obligations.  The NYDFS elaborated how these failures called all of Ocwen's systems into serious question:

> Ocwen has obligations under both New York and federal law, as well as various agreements with state and federal authorities, regarding how quickly it must communicate with borrowers on matters such as requests for mortgage modifications or the initiation of foreclosure proceedings. Ocwen is not meeting those obligations.  And given the issues with Ocwen's systems, it may be impossible to determine the scope of Ocwen's non-compliance.

107.    The NYDFS concluded this letter stressing the importance of these violations, and the dire consequences that would be thrust upon Ocwen and its related companies if the serious problems were not corrected:

> The stakes for borrowers and investors are enormous.  If the Department concludes that it cannot trust Ocwen's systems and processes, then it cannot trust Ocwen is complying with the law.  If Ocwen cannot demonstrate immediately that it is capable of properly servicing borrowers' needs, the Department intends to take whatever action is necessary to ensure that borrowers are protected.  (Emphasis added.)

108.    Before the markets closed on October 21, 2014, Ocwen attempted to deflect the allegations made by the NYDFS by issuing a press release over the GLOBENEWSWIRE.  In this press release, Ocwen maintained that the backdating was "inadvertent," affected only 283 borrowers in New York, and had been fully resolved.

109.    Despite Ocwen's attempt to deflect the accusations of the NYDFS, AAMC's share price declined by $55.99 per share, or 8.1%, from a close of $690.99 on October 20, 2014, to close at $635.00 on October 21, 2014.

110.     After the markets closed on October 21, 2014, Ocwen issued a second press release for that day over the GLOBENEWSWIRE entitled *Ocwen Corrects Earlier Statement in Response to Letter From New York Department of Financial Services*.  This second press release revealed that the first October 21, 2014 Press Release was materially false and misleading. Specifically, contrary to its original representation that backdating affected only 283 borrowers, this second press release disclosed that Ocwen was "aware of additional borrowers in New York who received letters with incorrect dates but does not yet know how many such letters there were."  In response to this disclosure, AAMC's share price declined an additional $59.99, or 9.4%, from its close of $635.00 on October 21, 2014 to close at $575.01 on October 22, 2014.

111.     On November 4, 2014, AAMC announced its financial results for the third quarter of 2014 in a press release distributed over the GLOBAL NEWSWIRE.  This press release was also attached as an exhibit to a Form 8-K that was filed with the SEC on the same date.  This press release disclosed that AAMC had earned a net income of $16.6 million and generated management incentive fees of $19.5 million.  On the same day, the Company filed its quarterly report for the third quarter of 2014 (the "Q3 2014 Form 10-Q") with the SEC.  The Q3 2014 Form 10-Q was signed by Defendant Lowe, and disclosed the same reported financial information as the November 4, 2014 press release.

112.     The November 4, 2014 press release and the Q3 2014 Form 10-Q were materially false and misleading in that they omitted to disclose:  (i) the true nature of the relationship between the Ocwen-Related Parties; (ii) that the transactions that took place between the Ocwen-Related Parties were the result of an unfair process from which Defendant Erbey failed to recuse himself, despite his admittedly conflicted interests; and (iii) that the unfair process led to transactions between the Ocwen-Related Parties that were not "arms-length" transactions and

- 38 -

resulted in certain transactions that were:  a) materially unfair to certain of the Ocwen-Related Companies; and/or b) resulted in Ocwen being incentivized to, and in fact violating various state and federal laws protecting consumers in mortgage serving transactions; and (iv) that Ocwen's violation of consumer protection laws was likely to have a detrimental future impact on AAMC.

113.    The November 4, 2014 press release and the Q3 2014 Form 10-Q were further materially false and misleading in that they omitted to disclose:  (i) that the unfair process in approving related-party transactions resulted in unreasonably large incentive management fees from RESI that distorted the financial results of the Company; and (ii) that as a result of the foregoing, the Company's disclosures concerning its transactions with RESI did not provide a fair presentation of the Company's finances, operations, and future prospects, including the Company's future growth and material trends.

Accordingly, the Company's statements regarding its net income, incentive management fees and receipt of expense reimbursements were materially false and misleading at all relevant times and lacked in any reasonable basis when made.

114.    On December 22, 2014, the NYDFS announced that it had entered into a settlement with Ocwen to address "serious conflict of interest issues" that had been uncovered during its investigation.  As part of the December 2014 DFS Settlement, Defendant Erbey was forced to resign from his executive chairman position at Ocwen, as well as from his positions of chairman at AAMC and each of the Ocwen-Related Companies, effective January 16, 2015.

115.    Under the terms of the December 2014 DFS Settlement, Ocwen was required to pay a total of $150 million in fines to help current and former homeowners in New York who had lost their homes to foreclosure while their loans were being serviced by Ocwen and to aid in developing housing, foreclosure relief and community redevelopment programs.  Ocwen was

further required to acknowledge that it had saddled borrowers with excessive fees resulting from its transactions with the Ocwen-Related Companies, including AAMC, and that it failed to maintain adequate systems to service hundreds of billions of dollars in mortgages.

116.    The NYDFS specifically noted that its review of Ocwen had "uncovered a number of conflicts of interest between Ocwen and [the Ocwen-Related Companies] all of which are chaired by Mr. Erbey, who is also the largest individual shareholder of each and the Executive Chairman of Ocwen." Further, despite the representations of AAMC and Erbey to the contrary, the NYDFS also specifically found that "Mr. Erbey has not in fact recused himself from approvals of several transactions with the related parties."

117.    In response to this news, and as the truth was fully revealed about AAMC's relationship with the Ocwen-Related Companies, AAMC's stock price plummeted over 23% from a closing price of $465.30 per share on December 19, 2014, to close at $356.50 per share on December 22, 2014.

118.    Finally, the Class Period closes on January 12, 2015, prior to the LOS ANGELES TIMES report on January 13, 2015, that the California Department of Business Oversight had announced that it was seeking to suspend Ocwen's license to operate in the state (one of Ocwen's major markets) due to serious concerns over its servicing practices and treatment of California homeowners. The announcement came at the end of its two-year investigation relating to Ocwen's servicing business in which Ocwen had repeatedly failed to fully cooperate. This news shocked the market, causing AAMC's share price to decline nearly 34% from a closing price of $321.81 per share on January 12, 2015, to close at $214.27 per share on January 13, 2015.

## VIII.   FOLLOWING ERBEY'S OUSTER, THE NON-CONFLICTED BOARD SLASHES THE AAMC MANAGEMENT FEE TO A MORE REASONABLE LEVEL

119.    On March 31, 2015, AAMC entered into a new Asset Management Agreement with RESI that dramatically reduced the management fee that would be paid to AAMC.  As disclosed in a Form 8-K filing on April 2, 2015, the new management fee would be calculated as follows:

> The AMA, which became effective on April 1, 2015, provides for a new management fee structure which replaces the incentive fee structure under the original asset management agreement as follows:
>
> - AAMC is entitled to a quarterly base management fee equal to 1.5% of the product of (i) Residential's average invested capital for the quarter multiplied by (ii) 0.25, while Residential has fewer than 2,500 single family rental properties actually rented ("Rental Properties"). The base management fee percentage increases to 1.75% of invested capital while Residential has between 2,500 and 4,499 Rental Properties and increases to 2.0% of invested capital while Residential has 4,500 or more Rental Properties;
>
> - AAMC is entitled to a quarterly incentive management fee equal to 20% of the amount by which Residential's return on invested capital exceeds a hurdle return rate of between 7% and 8.25% (depending on the 10-year treasury rate). The incentive management fee increases to 22.5% while Residential has between 2,500 and 4,499 Rental Properties and increases to 25% while Residential has 4,500 or more Rental Properties; and
>
> - AAMC is entitled to a quarterly conversion fee equal to 1.5% of the market value of the single-family homes leased by Residential for the first time during the quarter.

120.    This constituted a significant reduction in AAMC's management fee.  In an April 1, 2015, conference call and related presentation, Defendant Pandey admitted that <u>this new</u>

fee structure would have amounted to a 51% reduction in AAMC's previously reported revenues.[14]

### IX.   ADDITIONAL SCIENTER ALLEGATIONS

**A.   The Structure of the Ocwen-Related Companies Created a Powerful Motive for RESI to Overpay AAMC**

121.   Defendant Erbey's relatively larger interests in Altisource and AAMC, compared to his ownership of RESI or Ocwen) provided him with a clear motive to participate in related-party negotiations in contravention of Defendants' public statements to investors.  Defendant Erbey's larger ownership stake in Altisource and AAMC ensured that Defendant Erbey profited personally every time Ocwen or RESI diverted revenues to Altisource or AAMC.

122.   For instance, by approving Ocwen's force-placed arrangement with SWBC and Altisource, Defendant Erbey ensured that Altisource would earn approximately $65 million in annual revenues without providing any meaningful services to Ocwen.  Defendant Erbey's share of those revenues amounts to approximately $16.9 million annually.  Neither Altisource nor Erbey would have earned these funds if Ocwen had not entered into this arrangement.

123.   Likewise, Defendant Erbey's stake in Altisource meant that he also profited from Ocwen's decision to force its borrowers to pay 4.5% in fees to list on Hubzu, as opposed to the 1.5% fee Hubzu charged non-Ocwen borrowers.  Each time an Ocwen borrower paid that additional 3% over and above Hubzu's market rates, Defendant Erbey stood to earn 26% of that amount.  Moreover, Ocwen's decision to rely exclusively on Altisource's servicing platform despite widespread criticisms concerning its inability to handle the compliance needs associated with the volume of loans that Ocwen had acquired, benefited Defendant Erbey personally.

---

[14] Q4 2014 Earnings Call Transcript, p. 2; Presentation, p. 4.

124.     Likewise, Erbey personally profited by improperly diverting money from RESI to AAMC.  Erbey owned 4% of RESI stock, but 28% of AAMC.  For every dollar that Erbey diverted from RESI to AAMC, he personally received a $0.24 profit.

125.     Finally, Defendant Erbey personally profited every time a backdated letter caused an Ocwen-serviced property to enter foreclosure.  As alleged herein, once foreclosure proceedings began on an Ocwen-serviced loan, Ocwen engaged Altisource to provide various foreclosure-related services including, *inter alia*, valuation services and property preservation services, thereby increasing Altisource's revenues.  In addition, once Ocwen foreclosed on a property, it had the option either to transfer the property to Hubzu for sale (thereby causing Defendant Erbey's stake in Altisource to increase in value once again) or to RESI for rental (thereby causing Defendant Erbey's stake in AAMC/RESI to increase in value).

126.     In sum, Defendant Erbey's financial interest in each of the Ocwen-Related Companies, and the fact that each of the improper transactions alleged herein had the effect of transferring assets out of Ocwen and into an Ocwen-Related Company in which Defendant Erbey had a large financial interest, constitutes strong circumstantial evidence of his scienter.

**B.     Ocwen's Improper Practices Enriched Defendant Erbey**

127.     As discussed above, Ocwen's wrongful mortgage servicing practices and improper related-party transactions harmed an untold number of homeowners and investors by, *inter alia*, servicing loans on a platform that was patently incapable of ensuring compliance with the Company's regulatory obligations, siphoning money out of Ocwen and into other Erbey-owned Ocwen-Related Companies, and causing homeowners and investors to pay above-market rates for mortgage-related services.

128.   By contrast, each of the improper servicing practices referenced above enriched Defendant Erbey by funneling revenue away from Ocwen and into affiliated businesses in which he had a large financial stake.  In particular:

a)   By backdating borrower communications, Ocwen caused an untold number of borrowers to enter foreclosure, thereby enriching, *inter alia*, Altisource (and Defendant Erbey), which provided foreclosure-related services to Ocwen and listed Ocwen's foreclosed properties for auction on Hubzu;

b)   By installing a Chief Risk Officer and other senior employees at Ocwen that were also employed by Altisource, Defendant Erbey ensured that the interests of his affiliated companies would be placed above those of Ocwen's homeowners and investors;

c)   By paying inflated rates for Hubzu listings, Ocwen increased Altisource's revenue (along with the value of Defendant Erbey's investment in Altisource) to the detriment of homeowners and investors; and

d)   By entering into the force-placed insurance arrangement, which Defendant Erbey approved, Ocwen transferred approximately $65 million to Altisource annually in exchange for little to no services, further increasing the value of Defendant Erbey's stake in Altisource.

129.   In turn, the above practices directly contradicted Defendants' representations to Ocwen's investors that it was ensuring compliance with the NYDFS's requirements and appropriately managing Defendant Erbey's conflicts of interest.

**C.   Defendant Erbey's Positions Within the Ocwen-Related Companies Raises a Strong Inference of Scienter**

130.   Defendant Erbey was the Executive Chairman of Ocwen throughout the Class Period.  According to the AAMC April 30, 2014 Proxy Statement:  "As Chairman of the Board

of Directors, Mr. Erbey leads the Board and oversees meetings of the Board of Directors and the

delivery of information necessary for the Board's informed decision-making."[15]

131.    In addition, the April 30, 2014 Proxy further notes:

> The Board of Directors' role in risk oversight is consistent with the
> Company's leadership structure, with the Chief Executive Officer
> and other members of senior management having responsibility for
> assessing and managing the Company's risk exposure, and our
> Chairman, the Board of Directors and its committees providing
> oversight in connection with these efforts.[16]

132.    Defendant Erbey's dual role as Chairman of both Ocwen and Altisource raises a

strong inference of his awareness that the 4.5% fee Ocwen was paying to Hubzu was materially

larger than the 1.5% fee that Hubzu charged its non-Ocwen businesses.

133.    Similarly, Defendant Erbey's dual role as the Chairman of both RESI and AAMC

raises a strong inference that he was aware that the incentive management fee was grossly out of

line and inappropriately high.

134.    Additionally, Defendant Erbey's dual role as the Chairman of both Ocwen and

Altisource raises a strong inference of his awareness that Altisource was receiving $65 million in

compensation in exchange for little to no work under Ocwen's force-placed insurance

arrangement.

## X.    LOSS CAUSATION

135.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused

the economic losses suffered by Lead Plaintiff and the Class.

136.    Defendants' unlawful conduct alleged herein directly and proximately caused the

foreseeable losses suffered by Lead Plaintiff and the Class. The material false and misleading

---

[15]  Altisource Asset Management Corp., Proxy Statement (Form DEF 14A), at 6 (Apr. 30, 2014).

[16]  *Id*. at 9.

statements and omissions set forth above were widely disseminated to the securities markets, investment analysts, and the investing public. These materially false and misleading statements and omissions regarding, *inter alia*, AAMC's controls over related-party transactions and its compliance with applicable mortgage servicing rules and regulations caused the Company's common stock to trade at artificially-inflated prices throughout the Class Period.

137.     Immediately prior to the Class Period, AAMC shares closed trading at $132.00 per share on April 18, 2013.  Throughout the Class Period, as set forth above, the market price of AAMC securities were inflated by the material omissions and false and misleading statements made by the Company and the Individual Defendants, which were widely disseminated to the securities markets, investment analysts and the investing public.  The false and misleading statements materially misrepresented to the market the Company's financial results and prospects, and caused AAMC securities to trade at prices in excess of their true value, including the following:

- On May 9, 2013, AAMC announced positive earnings for the quarter ended March 31, 2013 and touted Ocwen's servicing platform.  These positive disclosures caused AAMC shares to climb from a closing price of $231.00 on May 8, 2013 to close at $259.90 per share on May 9, 2013 – a gain of 12.51%;

- On July 23, 2013, AAMC announced better than expected earnings for the quarter ended June 30, 2013, causing AAMC shares to climb from a close of $300.00 per share on July 22, 2013 to close at $325.00 per share on July 23, 2013 – a gain of $25.00 per share, or 8.3%;

- On October 22, 2013, AAMC announced earnings for the quarter ended September 30, 2013, including its first distribution of management fees from RESI.  This positive news caused AAMC shares to climb from $522.00 per share to close trading at $600.00 per share on October 22, 2013 – a gain of 14.9%;

- On December 3, 2013, Ocwen and AAMC disseminated an investor presentation, and Defendant Erbey personally spoke at an investor

- 46 -

conference in which he disclosed the relationships between the various Ocwen-Related Companies and falsely maintained that each of the companies had "separate boards and separate management," that there were "Robust Related Party Transaction Approval Policies" in place between the parties, and that he (Defendant Erbey) recused himself from decisions regarding related-party transactions.  The market took these false assurances at face value, causing AAMC shares to rise from $790.00 on December 2, 2013 to a close of $885.00 on December 3, 2013 -- an increase of 12.0%;

- On February 20, 2014, AAMC announced its earnings for the year and quarter ended December 31, 2013, including management incentive fees of $4.8 million from RESI, and filed its annual report on Form 10-K with the SEC.  The Form 10-K also made various disclosures about the independence of the Ocwen-Related Companies and the purported capabilities of Ocwen's servicing platform;

- On April 29, 2014, AAMC announced its financial results for the quarter ended March 31, 2014, reporting net income for the quarter of $7.2 million, including incentive management fees from RESI of $10.9 million.  In response, AAMC's share price increased from $907.50 to $949.00 per share – a gain of 4.6%;

- On July 22, 2014, AAMC announced its financial results for the quarter ended June 30, 2014, including incentive management fees from RESI of $13.7 million; and

- On November 4, 2014, AAMC announced its financial results for the quarter ended September 30, 2014, reporting net income of $16.6 million, including incentive management fees from RESI of $19.5 million.

138.    As a result, Lead Plaintiff purchased AAMC stock at artificially inflated prices. When the truth about AAMC's financial results and prospects was revealed to the market through several partial disclosures, the price of AAMC securities declined in response, as the artificial inflation caused by Defendants' misrepresentations and omissions was removed from the price of AAMC securities, thereby causing substantial damages to the Lead Plaintiffs, the Additional Named Plaintiffs, and the Class, including the following partial disclosures:

- On December 19, 2013, BLOOMBERG NEWS reported that Ocwen had agreed to a $2.1 billion settlement with the Consumer Financial Protection Bureau (the "CFPB"), in which the CFPB disclosed that "Ocwen violated federal

- 47 -

consumer financial laws at every stage of the mortgage servicing process."
In response, AAMC shares declined from a closing price of $995.50 per
share on December 18, 2013, to $918.53 per share on December 19, 2013,
and to $860.85 on December 20, 2013, for a two-day decline of $134.65 per
share, or 13.5%;

- On February 6, 2014, Ocwen disclosed that the NYDFS had placed "an
  indefinite hold" on its agreement to purchase of $39 billion in MSRs from
  Wells Fargo due to "concerns about Ocwen's servicing portfolio growth."
  The NYDFS's halt to the Wells Fargo transaction revealed that the NYDFS
  had identified ongoing compliance problems at Ocwen.  AAMC's share price
  declined 3.9% in response to this news, from a close of $936.90 on February
  5, 2014 to $900.77 on February 6, 2014;

- On February 26, 2014, the NYDFS disclosed that it had uncovered serious
  potential conflicts of interests between the Ocwen-Related Companies,
  causing AAMC's share price to decline more than 15.8% from $916.99 to a
  close of $772.00;

- On August 4, 2014, BLOOMBERG NEWS reported that the NYDFS had
  sent Ocwen a letter criticizing a related-party transaction between Ocwen and
  an Ocwen-Related Company, stating that "the role that Ocwen's Executive
  Chairman William C. Erbey played in approving this arrangement appears to
  be inconsistent with public statements Ocwen has made, as well as
  representations in company SEC filings."  In response, AAMC's share price
  fell from a close of $580.00 on August 1, 2014, to close at $548.24 on
  August 4, 2014 – a decline of 5.48%;

- On October 21, 2014, the NYDFS publicly issued a letter critical of Ocwen's
  related-party transactions, to which Ocwen responded, and later that day was
  forced to correct its response.  Despite Ocwen's attempt to deflect the
  accusations of the NYDFS, AAMC's share price declined by $55.99 per
  share, or 8.1%, from a close of $690.99 on October 20, 2014, to close at
  $635.00 on October 21, 2014;

- On December 22, 2014, the NYDFS announced that it had entered into a
  settlement with Ocwen to address "serious conflict of interest issues" that
  had been uncovered during its investigation, and that Defendant Erbey would
  resign as Chairman of AAMC and the other Ocwen-Related Companies
  effective January 16, 2015.  In response to this news, AAMC's stock dropped
  more than 23% to close at $356.50 per share on December 22, 2014;

- On January 12, 2015, the California Department of Business Oversight
  announced that it was seeking to suspend Ocwen's license to operate in the
  state (one of Ocwen's major markets) due to serious concerns over its
  servicing practices and treatment of California homeowners, which caused

- 48 -

AAMC's share price to decline nearly 34% from a closing price of $321.81 per share on January 12, 2015 to close at $214.27 per share on January 13, 2015.

## XI.    CLASS ACTION ALLEGATIONS

139.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who, between April 19, 2013, and January 12, 2015, inclusive, (the "Class Period") suffered losses as a result of their purchase of shares of AAMC common stock (the "Class").  Excluded from the Class are Defendants, the officers and directors of AAMC, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

140.    The members of the Class are so numerous that joinder of all members is impracticable.  As of October 31, 2014, AAMC had 2,189,875 shares of common stock outstanding.  Throughout the Class Period (after September 12, 2013), AAMC common stock was actively traded on the New York Stock Exchange.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by AAMC or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

141.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

142.    Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel competent and experienced in class action and securities litigation.

143.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of AAMC;

(c)    whether the price of AAMC securities were artificially inflated during the Class Period; and

(d)    to what extent the members of the Class have sustained damages and the proper measure of damages.

144.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XII.    APPLICABILITY OF PRESUMPTION OF RELIANCE

145.    Reliance on the material false statements and omissions alleged herein should be presumed for two independent reasons:  First, the Fraud on the Market doctrine applies; and second, the Presumption of Reliance on Material Omissions doctrine also applies.

- 50 -

A.      **The Fraud on the Market Doctrine**

146.    At all relevant times, the market for AAMC common stock was an efficient market for the following reasons, among others:

(a)     AAMC common stock met the requirements for listing and was listed and actively traded on the NYSE after September 12, 2013, a highly efficient and automated market;

(b)     Prior to September 12, 2013, AAMC common stock actively traded on the Over-the-Counter market;

(c)     as a regulated issuer, AAMC filed periodic public reports with the SEC and the NYSE;

(d)     AAMC regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(e)     AAMC was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

147.    As a result of the foregoing, the market for AAMC common stock promptly digested current information regarding AAMC from all publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all purchasers of AAMC common stock during the Class Period suffered similar injury through their purchase of AAMC common stock at artificially inflated prices, and a presumption of reliance applies.

B.      **The Presumption of Reliance on Material Omissions**

148.    A presumption of reliance is also appropriate in this case because the claims are grounded on material omissions.  Because this action alleges Defendants' failure to disclose material adverse information regarding the true nature of AAMC's relationship with the Ocwen-Related Companies (which relationships and resulting conflicts of interest caused the enforcement actions from the states of New York and California, as well as the Consumer Financial Protection Bureau), reliance is presumed pursuant to the *Affiliated Ute* doctrine because the claims are based on material omissions.[17]

149.    The omissions alleged herein are material because a reasonable investor might have considered them important in making an investment decision with respect to AAMC stock. Given the importance of the disclosure of the true nature of the relationships between AAMC and the Ocwen-Related Companies and the impact that these relationships had in bringing about the enforcement actions, the alleged omissions would have unquestionably been material to a reasonable investor.

## XIII.   NO SAFE HARBOR

150.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded

---

[17] *See Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of AAMC who knew that those statements were false when made.

## XIV.   COUNTS

### COUNT I
### Violation of Section 10(b) of
### the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

151.   Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

152.   During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

153.   Defendants:  (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's stock during the Class Period.

154.   Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for AAMC securities.  Lead Plaintiff

- 53 -

and the Class would not have purchased AAMC stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

155.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of AAMC securities during the Class Period.

**COUNT II**
**Violation of Section 20(a) of**
**the Exchange Act Against the Individual Defendants**

156.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

157.    The Individual Defendants acted as controlling persons of AAMC within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of AAMC, and their ownership of AAMC stock, the Individual Defendants had the power and authority to cause AAMC to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

**WHEREFORE**, Lead Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying Lead Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiffs' counsel as Lead Counsel;

- 54 -

B.      Awarding compensatory damages in favor of Lead Plaintiff and the other Class

members against all Defendants, jointly and severally, for all damages sustained as a result of

Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Lead Plaintiff and the Class their reasonable costs and expenses

incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury.


DATED:  June 19, 2015                    **COLIANNI & COLIANNI**


                                         By: _s/ Vincent Colianni, II_
                                         Vincent Colianni II (VI Bar No. 768)
                                         1138 King Street
                                         Christiansted, St. Croix
                                         U.S.V.I. 00820
                                         Telephone: (340) 719-1766
                                         Facsimile: (340) 719-1770
                                         Email: vinny@colianni.com

                                         _Liaison Counsel_


DATED:  June 19, 2015                    By: _s/ Steve W. Berman_
                                         Steve W. Berman
                                         Thomas E. Loeser
                                         Karl P. Barth
                                         **HAGENS BERMAN SOBOL SHAPIRO LLP**
                                         1918 Eighth Ave., Suite 3300
                                         Seattle, WA 98101
                                         Telephone: (206) 623-7292
                                         Facsimile:  (206) 623-0594
                                         Email:  steve@hbsslaw.com
                                                 TomLoeser@hbsslaw.com
                                                 karlb@hbsslaw.com

Reed R. Kathrein
Peter E. Borkon
Heidi H. Kalscheur
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Ave., Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
Email: reed@hbsslaw.com
        peterb@hbsslaw.com
        heidik@hbsslaw.com

*Counsel for Lead Plaintiff and*
*Lead Counsel for the Proposed Class*

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of June, 2015, I electronically filed the foregoing **CONSOLIDATED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing (NEF) to the following:

A. Jeffrey Weiss, Esq.
A.J. Weiss & Associates
6934 Vessup Lane
St. Thomas, VI  00802-1001

Pamela L. Colon, Esq.
Law Offices of Pamela L. Colon
27 & 28 King Cross Street, First Floor
Christiansted, VI  00820

Kevin A. Rames, Esq.
Law Offices of Kevin A. Rames, P.C.
2111 Company Street, First floor
Christiansted, VI  00820

Vincent Colianni II, Esq.
Colianni & Colianni
1138 King Street
Christiansted, VI  00820

_/s/ Steve W. Berman_
Steve W. Berman

010500-11  787780 V1