IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

| | | |
|---|---|---|
| CITY OF CAMBRIDGE RETIREMENT SYSTEM, et al. | : | CIVIL ACTION |
| | : | |
| | : | |
| v. | : | |
| | : | |
| ALTISOURCE ASSET MANAGEMENT CORPORATION, et al. | : | NO. 15-04 |

MEMORANDUM

Bartle, J.                                                                April  6 , 2017

This is a putative securities class action brought on
behalf of the shareholders of Altisource Asset Management
Corporation ("AAMC") against AAMC and its former Chairman of the
Board of Directors, William C. Erbey ("Erbey"), its former Chief
Financial Officer, Kenneth D. Najour ("Najour"), its former
Chief Executive Officer, Ashish Pandey (Pandey"), and its Chief
Financial Officer, Robin N. Lowe ("Lowe").  AAMC is a
publicly-traded asset management company incorporated in the
United States Virgin Islands.  At all relevant times, AAMC stock
traded on the New York Stock Exchange.

Now before the court is the motion of defendants to
dismiss plaintiffs' Consolidated Complaint pursuant to Rules
9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and
the Private Securities Litigation Reform Act ("PSLRA"),
15 U.S.C. § 78u-4, et seq.  In their motion to dismiss,
defendants contend that the Consolidated Complaint fails to

plead properly: (1) any false statements by AAMC; (2) scienter; (3) loss causation; and (4) an actionable primary violations under securities laws.

In Count I of their Consolidated Complaint, plaintiffs plead that defendants defrauded investors.  They allege that defendants artificially inflated the value of AAMC's stock by employing fraudulent schemes, making false statements of material fact and/or omitting material facts, and engaging in a course of business that operated as a fraud upon the shareholders regarding the company's financial outlook in violation of § 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Count II of the Consolidated Complaint, based on the same factual allegations, seeks to hold the individual defendants liable pursuant to § 20(a) of the Securities and Exchange Act, 15 U.S.C. §78a, as controlling persons of AAMC who had the power and authority to cause AAMC to engage in the alleged wrongful conduct.

II.

When deciding a motion to dismiss under Rule 12(b)(6), the court must accept as true all factual allegations in the complaint and draw all inferences in the light most favorable to the plaintiff.  See Phillips v. Cnty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008); Umland v. PLANCO Fin. Servs., Inc.,

-2-

542 F.3d 59, 64 (3d Cir. 2008).   The court may consider

"allegations contained in the complaint, exhibits attached to

the complaint, and matters of public record." Pension Benefit

Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196

(3d Cir. 1993) (citing 5A Charles Allen Wright & Arthur R.

Miller, Federal Practice and Procedure § 1357 (2d ed. 1990)).

The court may also consider "matters incorporated by reference

or integral to the claim, items subject to judicial notice,

matters of public record, orders, [and] items appearing in the

record of the case." Buck v. Hampton Twp. Sch. Dist., 452 F.3d

256, 260 (3d Cir. 2006) (citing 5B Charles Allen Wright & Arthur

R. Miller, Federal Practice and Procedure § 1357 (3d ed. 2004)).

Plaintiffs bring this suit as a class action pursuant

to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil

Procedure.[1]

---

1.   Lead Plaintiff is Denver Employees Retirement Plan.  It is a
government-defined benefit plan that provides retirement
benefits to members of the City and County of Denver, Colorado,
the Denver Health and Hospital Authority, and the Denver
Employees Retirement Plan.  The class is defined in the
complaint as all of those who purchased the publicly-traded
stock of AAMC between April 19, 2013 and January 12, 2015,
excluding defendants, other officers and directors of AAMC at
all relevant times, members of their immediate families and
their legal representatives, heirs, successors, or assigns and
any entity in which defendants have or had a controlling
interest.

III.

According to the Consolidated Complaint, defendant William C. Erbey served as the Chairman of the Board of Directors of a total of five publicly-traded companies related to the mortgage servicing business, including AAMC. These companies, known as the "Ocwen-Related Companies" included AAMC, Ocwen Financial Corporation ("Ocwen"), Altisource Portfolio Solutions ("ASPS"), and Altisource Residential Corporation ("RESI").[2] Ocwen, the lead company, is a large mortgage servicing company, while the other four companies are in the business of providing mortgage servicing related services to the Ocwen-Related Companies and to others. These services include foreclosing on distressed mortgages previously serviced by Ocwen, listing foreclosed properties for sale, and managing foreclosed properties as "real estate owned" or as rental properties, among other services.

AAMC provided asset management and corporate governance advising services to RESI, a real estate investment fund focused on acquiring, owning, and managing a large portfolio of single-family rental properties. Ocwen serviced RESI's portfolio of non-foreclosing homes during certain times when RESI could not immediately seize an underlying property

_____

2.  The fifth company, Home Loan Servicing Solutions, is not relevant to discussion.

after foreclosing on it.  According to the Consolidated
Complaint, RESI relied on Ocwen to perform adequately its
servicing obligations, and AAMC relied on RESI's success.

More specifically, at all relevant times Ocwen was the
fourth-largest servicer of mortgages in the country.  It
purchased Mortgage Servicing Rights ("MSRs") on subprime and
other high-risk loans and provided mortgage servicing and
subservicing operations on non-performing loans.  Generally,
Ocwen earned fees for its mortgage servicing operations as a
percentage of the Unpaid Principal Balances ("UPBs") of the
loans it serviced.  Increasing the size of Ocwen's portfolio of
MSRs and/or subservicing arrangement was key to the growth of
Ocwen's revenue.

RESI, a real estate investment trust, was in the
practice of purchasing portfolios of non-performing loans,
foreclosing on certain homes underlying the non-performing
loans, and retaining certain homes in its portfolio of
single-family rental properties.  Ocwen serviced RESI's
portfolio of non-foreclosing homes.

RESI contracted with AAMC to receive investment
advising services.  In exchange, AAMC received a quarterly
incentive management fee calculated by a formula based on the
amount of cash available for distribution to RESI shareholders.

Erbey, Chairman of RESI and of AAMC, claimed to have recused himself from any role in approving that fee.

ASPS provided mortgage serving technology services to Ocwen, which Ocwen used to determine how to optimize the net present value of a loan.  This service was the principal revenue source for ASPS.

At all relevant times, Erbey owned varying percentages of each of the companies' publicly traded stock.  For example, in 2014 he owned 14% of Ocwen, 28% of AAMC, 29% of ASPS, and 4% of RESI.  Plaintiffs maintained he had promised to recuse himself from decisions involving transactions among the five Ocwen-Related Companies, for all of which he was the Chairman.

Plaintiffs state that the AAMC's future success was tied to Ocwen's practices.  If Ocwen's ability to obtain substantial quantities of new MSRs was curtailed, or if Ocwen was unable competently to service MSRs, there may have been a materially adverse effect on RESI.  Plaintiffs assert that AAMC's future success was directly tied to the success of RESI.  Thus, any materially adverse effect on RESI had a materially adverse effect on AAMC.  AAMC reported its ties to RESI in its 2013 Form 10-K:

> [RESI] is currently our primary source of revenue and will drive our potential future growth.  The asset management agreement with [RESI] entitles us to "incentive management fees," that give us a share of [RESI]'s cash

flow available for distribution to its stockholders as Residential grows, as well as reimbursement for certain overhead and operating expenses. Accordingly, our operating results are highly dependent on [RESI]'s ability to achieve positive operating results.

According to the Consolidated Complaint, at all times throughout the class period AAMC reported "excellent financial results."[3] AAMC made public its financial results for the first quarter of 2013 in its Form 10-K filed with the Securities Exchange Commission ("SEC") on May 9, 2013. It identified AAMC's receipt of expense reimbursements as $895,000. On May 9, 2013, AAMC also issued a press release in GlobeNewswire announcing these results.

Defendants Erbey, Pandey, and Najour held a first quarter 2013 AAMC conference call on May 9, 2013. Erbey described AAMC's business strategy: "The key to our model is the existing operating infrastructure of our partners where Ocwen provides the non-performing loan servicing to [RESI] and [AAMC] provides renovation, leasing, and property management services to [RESI]."

---

3. Plaintiffs offer a proxy statement issued by AAMC to mark the commencement of the Class Period. It purportedly describes a policy that AAMC's board of directors had adopted to approve transactions with the Ocwen-Related Companies. However, the proxy statement included in the Consolidated Complaint appears to be the proxy statement of RESI, not AAMC. It makes no mention of AAMC.

AAMC's stock had a closing price of $231 per share on May 8, 2013, the day before the conference call. On May 9, 2013, the closing price of AAMC stock increased to $259.90 per share.

AAMC issued a press release over GlobeNewswire on July 23, 2013 announcing its 2013 second quarter results and included this press release as an exhibit to its Form 8-K that it filed with the SEC. It disclosed a net loss for the second quarter of $1.5 million. The same day AAMC filed with the SEC its second quarter 2013 Form 10-Q, signed by defendant Najour, for the period ending June 30, 2013. It disclosed a net loss of $1.5 million, including expense reimbursements of $1.2 million.

At close of business on July 22, 2013, AAMC stock had risen to $300 per share. On the following day when it released its 2013 second quarter results, AAMC stock closed even higher at $325 per share.

Later that year on September 12, 2013, AAMC stock began trading on the New York Stock Exchange. On October 22, 2013, AAMC issued a press release over GlobeNewswire containing its 2013 third quarter results and filed this press release as an exhibit to its Form 8-K. It disclosed a net loss for the third quarter of $2.6 million and "earned incentive management fees from [RESI] of $51,000 based on [RESI]'s payment of a dividend of $0.10 [per share] to its stockholders." The same

day, AAMC filed with the SEC its third quarter 2013 Form 10-Q, signed by defendant Najour.  It disclosed the same information as the press release.

AAMC's stock had a closing price of $522 per share on October 21, 2013, the day before it released its 2013 third quarter results.  On October 22, 2013, the closing price of AAMC stock was $600 per share, an increase of $78 per share.

On December 3, 2013, Ocwen gave an investor presentation, which was also filed as an exhibit to Ocwen's Form 8-K.  The presentation included the logos of each of the Ocwen-Related Companies and stated that Ocwen had created "strategic allies" by creating relationships with the Ocwen-Related Companies.  The presentation stated that: (1) The "strategic allies have sound corporate governance"; (2) Each company had "separate boards and separate management"; (3) There were "robust related party transaction approval policies" in place; and (4) They maintained "transparency in inter-company relationships through public company disclosures."  Defendant Erbey stated that he wanted to "stress first of all that these companies are not affiliates, that they are independent companies.  They have independent boards and they have independent management teams."  He also noted that "each company has its own separate Board of Directors, the majority of whom are independent, and we have robust [sic] related party

-9-

transaction approval process.  Any related-party transactions between the companies I actually recuse myself from that decision."

The day before the investor presentation, AAMC's stock closed at $790 per share.  On December 3, 2013, the day of the presentation, AAMC's stock had climbed to $885 per share.

On December 19, 2013, Bloomberg News reported that Ocwen agreed to a $2.1 billion settlement with the Consumer Financial Protection Bureau ("CFPB").  That day, the CFPB issued a press release stating that "Ocwen violated federal consumer financial laws at every stage of the mortgage servicing process."

On December 18, 2013, AAMC stock had closed at $995.50 per share.  On December 19, 2013, the day that the settlement was announced, AAMC stock fell to $918.53 per share.  On December 20, 2013, it was down to $860.85 per share.

Ocwen disclosed on February 6, 2014 that the New York State Department of Financial Services ("NYSDFS") had placed an indefinite hold on Ocwen's agreement to purchase $39 billion in MSRs from Wells Fargo due to "concerns about Ocwen's servicing portfolio growth."  The day before this disclosure, AAMC's stock had closed at $936.90 per share.  It closed at $900 per share on February 6, 2014.

On February 20, 2014, AAMC issued a press release over GlobeNewswire announcing its 2013 fourth quarter results and included this press release as an exhibit to its Form 8-K. It disclosed that AAMC had experienced a net loss of $4 million[4] for the fourth quarter, and a loss of $5.2 million for the year 2013. Additionally, the press released stated that AAMC had "generated positive adjusted earnings for the quarter of $4.0 million" and "earned incentive management fees from RESI of $4.8 million." Erbey commented on this press release:

> We are proud of our implementation of [RESI]'s differentiated business plan. We believe that, with AAMC's guidance, [RESI] successfully delivered on every critical aspect of its business model in 2013. I am pleased with what we have been able to accomplish for [RESI] and for our shareholders in our first full year of operations.

The same day, AAMC filed with the SEC its fourth quarter 2013 Form 10-K, signed by defendants Najour, Erbey, and Pandy. It disclosed that AAMC suffered a loss of $5.2 million for 2013, had a management incentive fee of $4.9 million, and had expense reimbursement of $5.4 million.

The fourth quarter 2013 Form 10-K also identified that there were potential conflicts of interest in transactions with

---

4. Plaintiffs' Consolidated Complaint states, "AAMC had experienced a net loss for the quarter of $0.4 million and of $5.2 million for the year." Presumably, "$0.4" million is a typographical error and $4.0 million is correct.

the Ocwen-Related Companies but stated that policies and
procedures existed to avoid the potential conflicts of interest.
Specifically the Form 10-K stated: "We follow policies,
procedures and practices to avoid potential conflict with
respect to our dealing with [AAMC], Ocwen, and [RESI], including
our Chairman recusing himself from negotiations regarding, and
approvals of, transactions with these entities[.]"   In addition
with respect to governmental regulations, the Form 10-K stated,
"We do not believe there are any governmental regulations that
will materially affect the conduct of our business."

In acknowledging RESI and AAMC's dependence on Ocwen,
the fourth quarter 2013 Form 10-K stated:

> We believe that [RESI]'s 15-year servicing
> agreement with Ocwen will allow [RESI] to
> acquire a high volume of non-performing
> mortgage loans due to Ocwen's established
> distressed mortgage loan servicing
> techniques and platforms.  Through the
> relationship with Ocwen, [RESI] employs
> various loan resolution methodologies with
> respect to its residential mortgage loans,
> including loan modification, collateral
> resolution and collateral disposition.

It also identified that Ocwen services RESI's acquired mortgage
loan portfolios and lauded Ocwen's mortgage servicing approach
and capabilities.

On February 26, 2014, the NYSDFS issued a public
letter concerning potential conflicts of interest between the
Ocwen-Related Companies.  It stated, in relevant part:

> [W]e uncovered these potential conflicts
> between and among Ocwen, Altisource
> Portfolio Solutions, S.A. ("Altisource
> Portfolio"), Altisource Residential
> Corporation, Altisource Asset Management
> Corporation, and Home Loan Servicing
> Solutions, Ltd. (together, the "affiliated
> companies"), all of which are chaired by
> William C. Erbey, who is also the largest
> shareholder of each and the Executive
> Charmain of Ocwen.
>
> . . .
>
> Presently, Ocwen's management owns stock or
> stock options in the affiliated companies.
> This raises the possibility that management
> has the opportunity and incentive to make
> decisions concerning Ocwen that are intended
> to benefit the share price of affiliated
> companies, resulting in harm to borrowers,
> mortgage investors, or Ocwen shareholders as
> a result.

AAMC stock ended the day at $916 on February 25, 2014.  It fell

to $722 per share following the press release on

February 26, 2014.

On March 19, 2014, the Glaucus Research Group reported

that it believed that "AAMC's Incentive Fee [charged to RESI] is

at least four to seven times higher than the compensation

received by similarly situated asset managers, and as such, is a

sweetheart deal that will unjustly enrich insiders with a

beneficial stake in AAMC at the expense of RESI's shareholders."

On April 21, 2014, the NYSDFS disclosed its Monitor's

findings that the relationship between certain Ocwen-Related

Companies "raises significant concerns regarding self-dealing."

AAMC issued a press release over GlobeNewswire on April 29, 2014 announcing its 2014 first quarter results and included this press release as an exhibit to its Form 8-K. It disclosed that AAMC had earned a net income of $7.2 million for the first quarter of 2014.[5] Defendant Pandey stated regarding these results, "We expect [RESI]'s improved loan resolutions will have meaningful impact on the growth of [RESI]'s loan portfolio." Defendant Erbey commented, "Under the management of AAMC, [RESI] has been able to pay an increased dividend for the second consecutive quarter." The same day, AAMC filed with the SEC its first quarter 2014 Form 10-Q, signed by defendant Najour. It reported a net income of $7.2 million for the quarter, including a management incentive fee from RESI of $10.9 million.

On June 23, 2014, RESI was shut out of a distressed loan auction conducted by the United States Department of Housing and Urban Development. On June 20, 2014, AAMC stock closed at a price of $1,099.02 per share. On the day that RESI was shut of the auction, June 23, 2014, AAMC stock dropped to $819.90 per share.

---

5. The Consolidated Complaint indicates that on April 29, 2014 a GlobeNewswire press release disclosed AAMC earned a net income of $7.2 million for the first quarter of 2013. (Emphasis added). Presumably, this is a typo and the correct year for the disclosure is 2014, not 2013.

On July 22, 2014, AAMC issued a press release over GlobeNewswire announcing its 2014 second quarter results and filed this press release with the SEC as an exhibit to its Form 8-K.  It disclosed that AAMC had earned a net income of $13.2 million[6] and "generated management incentive fees of $13.7 million."  The same day, AAMC filed with the SEC its 2014 second quarter Form 10-Q, signed by defendant Najour.  It reported the same information.

According to plaintiffs, Ocwen reported on July 31, 2014, a "sizable earnings miss for its second fiscal quarter, which it blamed on a host of regulatory issues that continued to plague it."[7]

In a Bloomberg News report dated August 4, 2014, the NYSDFS criticized a related-party transaction between Ocwen and one of the Ocwen-Related Companies.  In a public letter from the NYSDFS to Ocwen, the NYSDFS stated that a related-party transaction between Ocwen and ASPS "appears designed to funnel as much as $65 million in fees annually from already distressed

---

6.  The Consolidated Complaint states that AAMC disclosed in its July 22, 2014 press release that it earned a net income of $12.2 million in the second quarter of 2014.  According to AAMC's balance sheet filed with the SEC, the correct net income for the second quarter of 2014 is $13.2 million.

7.  Plaintiffs state that AAMC's stock price fell from $699.70 per share to $613.02 per share as a result of this news, but do not specify the closing dates associated with these prices.

homeowners to [ASPS] for minimal work."   The letter additionally
reported that:

> Owen hired [ASPS] to design Ocwen's new
> force-placed program with the expectation
> and intent that [ASPS] would use this
> opportunity to steer profits to
> itself. . . . [T]he role that Ocwen's
> Executive Chairman William C. Erbey played
> in approving this arrangement appears to be
> inconsistent with public statements Ocwen
> has made, as well as representations in
> company SEC filings.

On August 1, 2014, AAMC's stock price was $580 per share.   On
August 4, 2014, the day that the NYSDFS letter was publicized,
AAMC's stock price closed at $548.24 per share.

NYSDFS issued a letter on October 21, 2014 stating
that it had "uncovered serious issues with Ocwen's systems and
processes, including backdating of potentially hundreds of
thousands of letters to borrowers," in violation of regulatory
obligations.   It stated: "[G]iven the issues with Ocwen's
systems, it may be impossible to determine the scope of Ocwen's
non-compliance. . . . If Ocwen cannot demonstrate immediately
that it is capable of properly servicing borrowers' needs, the
Department intends to take whatever action is necessary to
ensure that borrowers are protected."   The same day Ocwen issued
a press release over GlobeNewswire stating that the backdating
was inadvertent, the backdating had affected only 283 borrowers
in New York, and that the backdating had been fully resolved.

At the close of business on October 20, 2014, AAMC's stock price was $690.99 per share.  At close on October 21, 2014, the day the letter was publicized, it was $635 per share.

After close of business on October 21, 2014, Ocwen issued a press release over GlobeNewswire entitled "Ocwen Corrects Earlier Statement in Response to Letter from New York Department of Financial Services."  It disclosed that Ocwen was "aware of additional borrowers in New York who received letters with incorrect dates but does not know yet how many such letters there were."  At close of business that day AAMC's stock traded at $635.00 per share.  At close on October 22, 2014, it declined to $575.01 per share.

On November 4, 2014, AAMC issued a press release over GlobeNewswire announcing its 2014 third quarter results and filed this press release with the SEC as an exhibit to its Form 8-K.  It disclosed AAMC had earned a net income of $16.6 million and generated incentive management fees of $19.5 million.  The same day, AAMC filed with the SEC its third quarter 2014 Form 10-Q, signed by defendant Lowe.  It disclosed the same information as the press release.

On December 22, 2014, NYSDFS announced it had entered into a settlement with Ocwen to address "serious conflict of interest issues" that had been uncovered.  As part of the settlement, Erbey was forced to resign from the position of

-17-

Executive Chairman at AAMC, Ocwen, and all of the Ocwen-Related Companies.  Ocwen was required to pay $150 million in fines to help current and former homeowners who had lost their homes to foreclosure while their loans were being serviced by Ocwen, and to help in developing housing, foreclosure relief, and community redevelopment programs.  Additionally, Ocwen was required to acknowledge that it had imposed excessive fees on borrowers as a result of its transactions with the Ocwen-Related Companies and that it failed to maintain adequate systems to service mortgages.  NYSDFS stated it had "uncovered a number of conflicts of interest between Ocwen and [the Ocwen-Related Companies] all of which are chaired by Mr. Erbey, who is also the largest individual shareholder of each and the Executive Chairman of Ocwen," and "Mr. Erbey has not in fact recused himself from approvals of several transactions with the related parties."

At close on December 19, 2014, AAMC's stock was $465.30 per share.  At close of business the day that the settlement was announced, AAMC's stock fell to $356.50 per share.

The class period closed on January 12, 2015.  On January 13, 2015, The Los Angeles Times reported that the California Department of Business Oversight ("CDBO") had announced that it was seeking to suspend Ocwen's license in the

state due to concerns about its servicing practices and
treatment of California homeowners.  According to plaintiffs
this announcement followed a two-year investigation by the CDBO
relating to Ocwen's servicing business with which Ocwen failed
fully to cooperate.  At close of business on January 12, 2015,
the day the class period closed, AAMC's stock was $321.81 per
share.  At close of business the following day, AAMC's stock was
down to $214.27 per share.

IV.

Plaintiffs contend that each of these disclosures and
events was materially false and misleading and made without any
reasonable basis in that in each of these, defendants omitted
the following information: (1) the true nature of the
relationship between the Ocwen-Related Companies; (2) that the
transactions that took place between the Ocwen-Related Companies
were the result of an unfair process from which defendant Erbey
failed to recuse himself despite his admitted conflicted
interest; (3) that Ocwen's violation of consumer protection laws
was likely to have a detrimental impact on AAMC; and (4) that
the unfair process led to transactions between the Ocwen-Related
Companies that were not "arms-length" transactions, and resulted
in certain transactions that were either materially unfair to
certain Ocwen-Related Companies and/or resulted in Ocwen being

-19-

incentivized to violate various state and federal laws that protected consumers in mortgage servicing transactions.

Plaintiffs additionally aver that the disclosures were materially false and misleading because they omitted: (1) that the unfair process in approving related-party transactions resulted in unreasonably large incentive management fees from RESI that distorted AAMC's financial results and (2) as a result of RESI's unreasonably large incentive management fees, AAMC's disclosures concerning its transactions with RESI did not provide a fair presentation of AAMC's finances, operations, and future prospects.

Plaintiffs assert that when defendants made those reports and disclosures, they knew or recklessly disregarded certain material facts which were not disclosed to the public and which served to artificially inflate AAMC's stock price.

According to plaintiffs, these alleged undisclosed material facts include the following:

(1)   Ocwen's Servicing Platform Problems

AAMC failed to disclose that Ocwen's servicing platform was materially flawed.  Ocwen's success directly impacted RESI's success, as RESI was entirely dependent on the servicing capabilities of Ocwen to implement RESI's business strategies.  As RESI was AAMC's primary source of revenue, its operating results were dependent on RESI's ability to achieve

-20-

positive operating results.  A flawed servicing platform by Ocwen would likely lead to regulatory action that would have a negative impact on AAMC's financial results and operations.

### (2)  Ocwen's Regulatory Risk and Conflict of Interest in Related-Party Transactions

Ocwen was subject to regulatory risk based on its materially flawed servicing platform and its conflicts in related-party transactions.

AAMC's financial condition was dependent on the success of RESI's business model, which was entirely dependent on Ocwen's ability to service RESI.  Due to Ocwen's materially flawed servicing platform, it faced significant regulatory risk that was likely to result in suspension or loss of license in New York and California.  Prior to the issuance of AAMC's 2013 first quarter Form 10-K, Ocwen's deficient loan servicing capabilities and practices were under review by the CDBO and the NYSDFS.

Throughout the class period, the Ocwen-Related parties were subject to heightened regulatory risk due to conflicts in Ocwen's related-party transactions.  The NYSDFS revealed in an April 21, 2014 letter to Ocwen that the online auction portal for the sale of foreclosures, Hubzu, charged Ocwen up to three times higher for transactions with ASPS than it charged other customers.  According to the NYSDFS:

> In other words, when Ocwen selects its
> affiliate Hubzu to host foreclosure or short
> sale auctions on behalf of mortgage
> investors and borrowers, the Hubzu auction
> fee is 4.5%; when Hubzu is competing for
> auction business on the open market, its fee
> is as low as 1.5%.  These higher fees, of
> course, ultimately get passed onto the
> investors and struggling borrowers who are
> typically trying to mitigate their losses
> are not involved in the selection of Hubzu
> as the host site.

The NYSDFS released another letter, this time referring to Erbey's role in a related-party transaction between ASPS.  It stated that "the role that Ocwen's Executive Chairman William C. Erbey played in approving this arrangement appears to be inconsistent with public statements Ocwen has made, as well as representations in company SEC filings."  On December 14, 2014 the NYSDFS reported it had "uncovered a number of conflicts of interest between Ocwen and [the Ocwen-Related Companies] all of which are chaired by Mr. Erbey, who is also the largest individual shareholder of each and the Executive Chairman of Ocwen," and "Mr. Erbey has not in fact recused himself from approvals of several transactions with the related parties."

### (3)  "Arms'-Length" Transactions

Transactions that took place between the Ocwen-Related Companies were the result of an unfair process from which Erbey failed to recuse himself, despite his admitted conflict of interest.  This process led to transactions between the

Ocwen-Related Companies that were not "arms'-length" transactions.  Furthermore, these transactions incentivized Ocwen to violate state and federal consumer protection laws and resulted in, in some situations, Ocwen violating consumer protection laws.

(4)  AAMC's Excellent and Escalating Financial Results

AAMC represented that it was a growing business transitioning from a start-up company to a company generating revenue of $20 million per quarter.  Its revenue was the product of an unfair, unsustainable related-party transaction process. A report of Glaucus Research Group of March 19, 2014 stated:

> We believe that AAMC's Incentive Fee is at least four to seven times higher than the compensation received by similarly situated asset managers, and as such, is a sweetheart deal that will unjustly enrich insiders with a beneficial stake in AAMC at the expense of RESI's shareholders. . . . Because AAMC's executive team owns far more equity in AAMC than RESI, AAMC's management team is financially incentivized to generate large management fees at the expense of RESI shareholders.

Plaintiffs allege in their Consolidated Complaint that defendants were aware of the above undisclosed information and that their failure to inform investors about them made their disclosure and reports about the financial health of AAMC false and misleading.  Because of these false and misleading statements, plaintiffs maintain that AAMC common stock traded at

artificially inflated share prices between April 19, 2013 and January 12, 2015.  According to the Consolidated Complaint, defendants' false or misleading disclosures caused AAMC stock to rise from $231 per share on May 8, 2013, to more than $995 per share in December 2013.  Subsequent partial corrective disclosures negatively impacted AAMC's stock price and caused the stock price to plummet with each corrective disclosure.

V.

As noted above, defendants now move to dismiss the Consolidated Complaint pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure and pursuant to the PSLRA.

Count I of the Consolidated Complaint alleges defendants violated § 10(b) of the Securities and Exchange Act and Rule 10b-5 promulgated thereunder.  Section 10(b) prohibits the "use or employ, in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate[.]" 15 U.S.C. § 78j.  Rule 10b-5 provides that:

> It shall be unlawful for any person . . . [t]o make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

In order to state a claim for relief under § 10(b), a plaintiff must plead facts demonstrating that "(1) the defendant made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading; (2) the defendant acted with scienter; and (3) the plaintiff's reliance on the defendant's misstatement caused him or her injury." Cal. Pub. Employees' Ret. System v. Chubb Corp., 394 F.3d 126, 143 (3d Cir. 2004); see also Dura Pharm., Inc. v. Broudo, 544 U.S. 336 (2005).

A securities fraud claim that is challenged on a motion to dismiss must satisfy the pleading standard under Rule 12(b)(6) of the Federal Rules of Civil Procedure as well as the heightened pleading requirements of Rule 9(b) and the PSLRA. City of Roseville Employees' Retirement System v. Horizon Lines, Inc., 442 F. App'x 672, 674 (3d Cir. 2011).

In order to survive a motion to dismiss under Rule 12(b)(6), the pleading at issue must "contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The claim must do more than raise a "mere possibility of misconduct." Fowler v. UPMC Shadyside, 578 F.3d 203, 211 (3d Cir. 2009) (quoting Iqbal, 556 U.S. at

679).  Under this standard, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.  A claim should be dismissed under Rule 12(b)(6) only where it "appears beyond doubt that the plaintiff can prove no set of facts in support of the claim which would relief." Chubb, 394 F.3d at 143.  As noted, we accept all well-pleaded allegations in the complaint as true and all reasonable inferences are drawn in favor of the non-moving party.  See id.

Independent of the pleading standard set forth under Rule 12(b)(6), Rule 9(b) requires a heightened pleading standard with respect to factual allegations underlying a claim of fraud. Rule 9(b) provides, in relevant part, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake[.]"  Fed. R. Civ. P. 9(b).  Our Court of Appeals has reiterated that "this particularity requirement has been rigorously applied in securities fraud cases."  In re Rockefeller Center Properties, Inc. Sec. Litig., 311 F.3d 198, 216 (3d Cir. 2002).  To meet the heightened pleading requirements of Rule 9(b), a plaintiffs must support their allegations of securities fraud "with all of the essential factual background that would accompany the first paragraph of any newspaper - that is, the who, what, when, where and how of the events at issue."  Id. at 217.  Rule 9(b) requires

-26-

plaintiffs to plead "(1) a specific false representation [or omission] of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his damage." Id. at 216 (quoting Shapiro v. UJB Financial Corp., 964 F.2d 272, 278 (3d Cir. 1992)). "Although Rule 9(b) falls short of requiring every material detail of fraud such as date, location, and time, plaintiffs must use 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'" Chubb, 394 F.3d at 144; In re Rockefeller, 311 F.3d at 216.

In addition to the pleading requirements of Rules 12(b)(6) and 9(b), the PSLRA "imposes another layer of factual particularity to allegations of securities fraud." In re Rockefeller, 311 F.3d at 217. The PSLRA specifies two distinct pleading requirements, both of which must be met in order to survive a motion to dismiss. Institutional Investors Group v. Avaya, Inc., 564 F.3d 242, 252 (3d Cir. 2009). Under the PSLRA's pleading requirements, "any private securities complaint alleging that the defendant made a false or misleading statement must: (1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading,' and (2) 'state with particularity facts giving rise

to a strong inference that the defendant acted with the required state of mind[.]'" <u>Tellabs, Inc., v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 321 (2007) (quoting 15 U.S.C. § 78u-4(b)) (internal citations omitted). "Significantly, both provisions require facts to be pleaded 'with particularity.'" <u>Avaya</u>, 564 F.3d at 253.

Our Court of Appeals has explained the interplay between Rule 12(b)(6), Rule 9(b), and the PSLRA:

> [U]nless plaintiffs in securities fraud actions allege facts supporting their contentions of fraud with the requisite particularity mandated by Rule 9(b) and the Reform Act [PSLRA], they may not benefit from inferences flowing from vague or unspecific allegations - inferences that may arguably have been justified under a traditional Rule 12(b)(6) analysis. . . . In other words, pursuant to this 'modified' Rule 12(b)(6) analysis, 'catch-all' or 'blanket' assertions that do not comply with the particularity requirements are disregarded.

<u>Chubb</u>, 394 F.3d at 145. (internal citations and quotations omitted).

Defendants first argue that the Consolidated Complaint must be dismissed because plaintiffs do not allege any false statement by AAMC. Defendants contend that the alleged false statements put forth in the Consolidated Complaint were not authored by AAMC, were accurate statements of historical fact, or were vague and indefinite statements that are not actionable

as a matter of law.  Defendants also argue that plaintiffs fail to allege facts that create an inference of scienter.  Finally, defendants maintain that the Consolidated Complaint must be dismissed because plaintiffs fail to plead loss causation.

Plaintiffs maintain that material statements were omitted from or false statements were included in the SEC filings of AAMC and the few statements made by Erbey on behalf of AAMC.  Plaintiffs group the false statements or omissions made on behalf of AAMC into four categories:  (1) statements regarding Ocwen's servicing capabilities; (2) statements regarding the related-party transaction approval process; (3) statements regarding AAMC's increasing financial success; and (4) statements regarding the lack of potential regulatory risk.

First we must determine whether plaintiffs have pleaded with sufficient particularity that statements or omissions made on behalf of AAMC were false or misleading, and how the statements or omissions were false or misleading. 15 U.S.C. § 78u-4(b); Tellabs, 551 U.S. at 321.  The PSLRA requires that allegations regarding statements or omissions that are set forth upon information or belief must be pleaded with particularity, that is with all facts upon which the belief is based.  15 U.S.C. § 78u-4(b).  The same is true for allegations grounded on the investigation of counsel.  In re Equimed, Inc.,

-29-

2000 WL 562909 at *4 (E.D. Pa. May 9, 2000). Plaintiffs' allegations are made upon both information and belief and upon investigation of counsel. Thus they must allege with particularity the factual basis for which they base their claims. In an effort to satisfy this requirement of the PSLRA, the Consolidated Complaint contains "true facts" allegedly known by defendants that were disclosed by parties other than AAMC.[8] Plaintiffs put forth these "true facts" in an effort to demonstrate that defendants knew certain information about the financial condition of AAMC but failed to disclose it. In addition to "true facts" from other sources, plaintiffs cite numerous SEC filings by AAMC in an effort to show that defendants' disclosures were false or misleading. Plaintiffs have not satisfied the PSLRA.

The "true facts" are disclosures made by Ocwen, statements made by Erbey on behalf of Ocwen, and announcements of state regulatory disciplinary action against Ocwen. Detailed more specifically above, the "true facts" included disclosures made on behalf of Ocwen, investigations conducted by the CDBO, the CFBP, and NYSDFS, and reports by the Glaucus Research Group.

---

8. While Plaintiffs do not use the label "true facts," we will use this label to describe purportedly true facts that were disclosed by parties other than the defendants and which plaintiffs suggest demonstrates that defendants knew of certain information and failed to disclose it.

The PSLRA requires plaintiffs to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." Tellabs, 551 U.S. at 321. When a complaint puts forth "true facts" in order to aver that a defendant's disclosures and financial results were materially false and misleading, "true facts" are of "paramount importance" because they provide the basis for plaintiffs' claim that a defendant's disclosures were materially false and misleading. Chubb, 394 F.3d at 145. Our Court of Appeals has instructed that "a complaint can meet the pleading requirement dictated by the PSLRA by providing sufficient documentary evidence and/or a sufficient description of the personal sources of the plaintiffs' beliefs." Id. at 147.

Here, plaintiffs have met this initial pleading requirement. They have offered sufficient documentary evidence in the form of "true facts." Plaintiffs have offered documentary evidence to demonstrate why defendants' disclosures were false and misleading. They have identified the sources of the "true facts" as Bloomberg News, the NYSDFS, the CDBO, The Los Angeles Times, Glaucus Research Group, the CFPB, and statements made by Erbey on behalf of Ocwen. Moreover, they have provided the text of the "true facts" and have provided the dates that the "true facts" were disclosed and the corresponding dates of when the events occurred. In sum, plaintiffs have

-31-

provided the "who, what, when, where, and how" of the events at issue. In re Rockefeller Center, 311 F.3d at 212. The Consolidated Complaint contains more than a "barebones sketch" of the documentary evidence. See Chubb, 394 F.3d at 148.

We turn now to examine how the "true facts" allege with particularity that defendants' disclosures were false and misleading. Plaintiffs contend that AAMC's success was dependent on Ocwen's success, and AAMC's SEC filings and public disclosures were false and misleading because they omitted "true facts" about Ocwen's mortgage servicing capabilities, regulatory risks, and effects on AAMC's financial status. Plaintiffs have missed the mark. While they have alleged with particularity the "true facts," they have failed to plead with particularity how the "true facts" show that AAMC's disclosures were false and misleading.

Plaintiffs have alleged a connection between AAMC and RESI and a connection between RESI and Ocwen. However, they have not pleaded the connection between AAMC and Ocwen necessary to explain that "true facts" about Ocwen show that AAMC's disclosures were false and misleading. Furthermore, even where plaintiffs have set forth facts tying AAMC to Ocwen, plaintiffs do not plead how defendants' disclosures were false or misleading. Thus, plaintiffs have failed to satisfy this pleading requirement of the PSLRA.

Plaintiffs' attempt to connect Ocwen with AAMC fails for purposes of alleging a viable securities fraud violation. The Consolidated Complaint provides numerous examples of disclosures by AAMC acknowledging that its success is dependent on RESI. For example, AAMC's 2013 Form 10-K disclosed its ties to RESI, stating that "[RESI] is currently our primary source of revenue and will drive our potential future growth. . . . [O]ur operating results are highly dependent on [RESI]'s ability to achieve positive operating results." Likewise, plaintiffs have provided "true facts" that connect Ocwen to RESI and RESI to AAMC. For example, AAMC disclosed in the same Form 10-K:

> [RESI] is contractually obligated to service the residential mortgage loans that it acquires. [RESI] does not have any employees, servicing platform, licenses or technical resources necessary to service its acquired loans. Consequently, [RESI] has engaged Ocwen to service the non-performing and sub-performing loans it acquires. If for any reason Ocwen is unable to service these loans at the level and/or cost that [RESI] anticipates, or if [RESI] fails to pay Ocwen or otherwise defaults under the Ocwen servicing agreement, and Ocwen ceases to act as its servicer, an alternate servicer may not be readily available on favorable terms, or at all, which could have a material adverse effect on [RESI].

Insofar as plaintiffs have attempted to connect AAMC with Ocwen in such a way that would require AAMC to disclose "true facts" about Ocwen, plaintiffs have not only failed to plead this connection but they have failed to explain how the

-33-

"true facts" they rely on shows that AAMC's disclosures were false or misleading.  A "true fact" in and of itself does not satisfy the heightened pleading requirement of the PSLRA. 15 U.S.C. § 78u-4(b); Tellabs, 551 U.S. at 321.  Plaintiffs have failed to plead how any "true fact" about Ocwen amounts to an omission or misstatement by AAMC.

Now we turn to "true facts" and disclosures by AAMC that are not actionable statements.  Plaintiffs offer statements on behalf of AAMC that acknowledge that AAMC may be negatively impacted if Ocwen and/or RESI failed to perform and plaintiffs offer disclosures by AAMC regarding the potentially negative effect on RESI that would result if Ocwen were unable to perform.  Plaintiffs also offer disclosures on behalf of AAMC regarding the potentially negative effect on RESI that would result if Ocwen were unable to perform its mortgage servicing activities.  Plaintiffs offer these disclosures by AAMC in an attempt to connect with Ocwen with AAMC that would show that AAMC omitted from its SEC disclosures information about Ocwen's mortgage servicing capabilities and regulatory risks.  However, plaintiffs have again failed to plead these allegations with particularity.  AAMC's disclosures and "true facts" offered by plaintiffs about Ocwen, do not, on their own, explain how AAMC disclosed false or misleading statements.  Indeed AAMC stated that its successes depended indirectly on Ocwen's.  The PSLRA

-34-

requires plaintiffs to plead both the statement or omission on behalf of the defendant that was false or misleading, and how the statement or omission was false or misleading.  15 U.S.C. § 78u-4(b); Tellabs, 551 U.S. at 321.  Here, plaintiffs offer a series of disclosures by AAMC and a series of "true facts" by other sources.  They have not pled how the statements or omissions on behalf of AAMC were false or misleading.  15 U.S.C. § 78u-4(b); Tellabs, 551 U.S. at 321.

While AAMC's disclosures acknowledge that its results are dependent on RESI's results and RESI's results are dependent on Ocwen's capabilities, plaintiffs did not plead with particularity how disclosures on behalf of AAMC were false or misleading with respect to (1) statements regarding Ocwen's mortgage servicing capabilities; (2) statements regarding AAMC's financial status; and (3) statements regarding Ocwen's potential regulatory risk.  In each of these categories of statements by AAMC, plaintiffs have failed to plead how the "true facts" regarding Ocwen demonstrate that AAMC's disclosures were false and misleading.

Finally, we consider disclosures by AAMC regarding the related-party transaction approval process and conflicts of interest between the Ocwen-Related Companies.  Plaintiffs argue that AAMC's disclosures were false or misleading because they failed to include material facts regarding conflicts of interest

between the Ocwen-Related Companies.   This contention fails for two reasons.

      First, plaintiffs fail to explain how AAMC's disclosures were false or misleading.   Plaintiffs again rely on "true facts" to plead this contention.   They rely on reports by the NYSDFS and the Glaucus Research Group to make the conclusory allegations that while AAMC's fourth quarter Form 10-K stated that Erbey had promised to recuse himself from transactions between the Ocwen-Related Companies, in fact he did not, and to show conflicts of interest between Ocwen and AAMC.   Particularly, a February 26, 2014, NYSDFS public letter stated that it had uncovered <u>potential</u> conflicts of interest between Ocwen, AAMC, and the Ocwen-Related Companies.   While this letter was not disclosed by AAMC, AAMC stated in its fourth quarter 2013 Form 10-K, issued February 20, 2014: "We follow policies, procedures and practices to avoid potential conflict with respect to our dealing with [AAMC], Ocwen, and [RESI], including our Chairman recusing himself from negotiations regarding, and approvals of, transactions with these entities[.]"   The only transaction identified by plaintiffs as a "true fact" was an alleged transaction between ASPS and Ocwen.   Plaintiffs offer this "true fact" in the form of a conclusory allegation by the NYSDFS, reported by <u>Bloomberg News</u> on August 4, 2014.   The <u>Bloomberg News</u> report did not mention AAMC or AAMC involvement.

A legal theory based on conclusory allegations, without factual support, is insufficient to state a claim for relief under the applicable pleadings requirements.  In re Alpharma Inc. Sec. Litig., 372 F.3d 137, 150 (3d Cir. 2004). Plaintiffs base their legal theory that AAMC failed to disclose its involvement in related party transactions on reports from the NYSDFS, such as the ones outlined above, and regulatory action against Ocwen by state agencies.  They have no identified an improper transaction which AAMC was involved.  They simply have identified that potential conflicts of interest existed according to the NYSDFS and Ocwen's settlement as a result. Thus, plaintiffs have not pleaded with particularity how these reports show that AAMC's disclosures were false or misleading.

Second, even if plaintiffs have pleaded the falsity and scienter requirements, they have failed to plead loss causation under 15 U.S.C. § 78u-4(b) with respect to allegations regarding related-party transaction approval process and conflicts of interest between the Ocwen-Related Companies.

In a securities fraud action, a plaintiff must plead loss causation in addition to falsity and scienter.  15 U.S.C. § 78u-4(b).  Loss causation requires a causal connection between the material misrepresentation and the loss.  15 U.S.C. § 78u-4(b); Dura, 544 U.S. at 342.  Causation is two-pronged. "A plaintiff must show both:  (1) 'transaction causation' (or

'reliance'), i.e., that but for the fraudulent misrepresentation or omission, the investor would not have purchased or sold the security; and (2) 'loss causation.' i.e., that the fraudulent misrepresentation or omission actually caused the economic loss suffered." McCabe v. Ernst & Young, LLP, 494 F.3d 418, 425 (3d Cir. 2007) (quoting Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 172 (3d Cir. 2001)).   "The loss causation inquiry asks whether the misrepresentation or omission proximately caused the economic loss." Id. at 426; EP Medsystems, Inc. v. EchoCath, Inc., 235 F.3d 865, 883 (3d Cir. 2000).   "[A]n inflated purchase price will not itself constitute or proximately cause the relevant economic loss." Id. at 425; Dura, 544 U.S. at 346.

Plaintiffs have failed to plead loss causation here. The Consolidated Complaint contains reports of the price of AAMC stock before and after each disclosure by any party discussed in the Consolidated Complaint.   While plaintiffs state that defendants' false and misleading statements or omissions caused plaintiffs to purchase AAMC stock at an artificially inflated price, and subsequent disclosures caused the price to decline, they fail to support the causal connection between defendants' statements and loss with facts other than the inflated purchase price of AAMC.

-38-

Finally, plaintiffs contend that AAMC's disclosures were false or misleading because AAMC did not disclose what the Glaucus Research Group reported on March 19, 2014 about the incentive management fee AAMC charged to RESI.  This, however, does not constitute loss causation to AAMC shareholders.  If anything, plaintiffs have simply presented facts supporting loss suffered by RESI shareholders.

While it should not be "burdensome" for a plaintiff to show that he has suffered an economic loss, "allowing a plaintiff to forgo giving any indication of the economic loss and proximate cause that the plaintiff has in mind would bring about the harm of the very sort the [securities fraud] statutes seek to avoid." Dura, 544 U.S. at 347.  Plaintiffs have failed to show how defendants' false and misleading statements or omissions regarding related-party transaction approval process and conflicts of interest between the Ocwen-Related Companies were a substantial factor in causing plaintiffs' loss. McCabe, 494 F.3d at 429.  As noted above, an inflated purchase price does not "constitute or proximately cause" economic loss. Id. at 425. Thus, plaintiffs have insufficiently pleaded loss causation.  Id.

Plaintiffs have failed to plead a cause of action under 15 U.S.C. § 78u-4.  Thus we will dismiss Count I of the Consolidated Complaint.

VI.

Count II of the Consolidated Complaint asserts a claim against defendants Erbey, Najour, Pandey, and Lowe under § 20(a) of the Securities and Exchange Act.  15 U.S.C. § 78t.  Section 20(a) provides for securities fraud liability against "controlling persons," making them jointly and severally liable with the corporation they control.  Id.  "[I]t is well-settled that controlling person liability is premised on an independent violation of the federal securities laws."  In re Rockefeller Center, 311 F.3d at 211; In re Merck & Co., Inc. Sec. Litig., 432 F.3d 261, 275 (3d Cir. 2005).  Plaintiffs' derivative claim under § 20(a) cannot be maintained unless they have brought a viable underlying claim for violation of the Act separate and apart from their §20(a) claim.  In re Rockefeller Center, 311 F.3d at 211-12.

Because we will dismiss plaintiffs' only other claim under the Act, their § 20(a) claim also fails.  Id.

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

CITY OF CAMBRIDGE RETIREMENT         :          CIVIL ACTION
SYSTEM, et al.                       :
                                     :
        v.                           :
                                     :
ALTISOURCE ASSET MANAGEMENT          :          NO. 15-04
CORPORATION, et al.                  :

ORDER

AND NOW, this **6th** day of April, 2017, for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that the motion of defendants Altisource Asset Management Corporation, William C. Erbey, Kenneth D. Najour, Ashish Pandey, and Robin N. Lowe to dismiss the consolidated complaint (Doc. # 51) is GRANTED and the action is DISMISSED for failure to state a claim upon which relief can be granted under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4, et seq.

BY THE COURT:

_Harvey Bartle_                       J.

HARVEY BARTLE III
SITTING BY DESIGNATION